CASE 109—INDICTMENT FOR CONSPIRACY—JUNE 15.

# Aetna Insurance Co., Etc. v. Commonwealth.

### APPEAL FROM FRANKLIN CIRCUIT COURT.

1. CONSPIRACY—TO FIX INSURANCE RATES.—It is not an indictable offense to conspire to fix insurance rates, either by virtue of section 3915 of the Kentucky Statutes against conspiracies to regulate the prices of "merchandise, manufactured articles or property of any kind;" or by the common law as it existed prior to the fourth year of King James I.

2. PROCESS—SERVICE ON INSURANCE COMMISSIONER UPON INDICTMENT AGAINST INSURANCE COMPANY.—A summons upon indictment against an insurance company may properly be served upon the Insurance Commissioner by virtue of section 631 of the Kentucky Statutes.

PIRTLE & TRABUE FOR THE APPELLANTS. (W. S. PRYOR, GEORGE L. PADDOCK AND J. I. LANDES OF COUNSEL.)

1. The service of summons upon the Insurance Commissioner, W. H. Stone, was not sufficient to bring the defendants before the court. Ky. Stats., sec. 631; Criminal Code, secs. 138, 146, 147.

2. The indictment is insufficient in law and the circuit court erred in overruling the demurrer thereto. United States v. Walsh, 5 Dill., 58; Com. v. Shedd, &c., 7 Cush., 514; March v. People, 7 Barb., 391; Lambert v. People, 9 Cowen, 578; United States v. Cruikshank, &c., 92 U. S., 542; Steamship Co. v. McGregory, &c., Appeal Cases (1892), 25; Hornby v. Close L. R. 2 Q. B., 153; Lord Campbell, C. J., in Hilton v. Eckersley, 6 El. & Bl., 47, 66; Hannen J. in Farrer v. Close, 4 Q.B., L. P., 602, 612; Tarleton v. McQawley, Peak, N. P. V., 270; Clifford v. Brandon., 2 Camp, 358; Gregory v. Brunswick, 6 Man. & G., 205; Carrington v. Taylor, 11 East, 571; Keeble v. Hickeringill, 11 East, 574; Garrett v. Taylor, Cro. Jac., 567; Bowen v. Hall, 6 Q. B. D., 333; Lumly v. Gye, 2 E. & B., 216; Skinner v. Gunton, 1 Wm. Saund., 229; Hutchings v. Hutchings, 7 Hill N. Y. Cases, 104; Bigelow Leading Cases on Torts, 207; O'Connell v. The Queen, 11 C. L. & F., 155; Reg v. Parnell, 14 Cox Crim. Cases, 508; Reg. v. Rowlands, 17 Q. B., 671; Macauley v. Tierney, 19 R. I., 255; s. c. 61 Am. St. Rep., 770; Mogul S. S. Co. v. McGregory, L. R., 23 Q. B., 598; L. R. (1892) App. Cases. 25; Bohn Mfg. Co. v. Hollis, 54 Minn., 223;

Aetna Insurance Co., &c., v. Commonwealth.

s. c. 40 Am. St. Rep., 319; Sayre v. Louisville Union Benevolent Assn., 1 Duv., 143; Wharton's Crim. Law, vol. 1, p. 786; 3 Chitty's Crim. Law, 1139; Cote v. Murphy, 159 Penn. St., 420; s. c. 39 Am. St. Rep., 686; Com. v. Carlisle, Bridge, N. P., 39; Bohn Co. v. Hollin, 54 Minn., 223; s. c. 40 Am. St. Rep., 319; Queen Ins. Co. v. State, 86 Texas, ——; s. c. 22 L. R. A., 483; People v. Chicago Gas Trust Co., 130 Ill., 268; s. c. 8 L. R. A., 497; India Bagging Assn. v. Kock, 8 La. An., 164; Santa Clara Valley Mill & Lumber Co. v. Hayes, 76 Cal., 387; Morris Run Coal Co. v. Bardey Coal Co., 68 Pa., 173; s. c. 8 Am. Rep., 159., 4 Black. Com., ch. 12, sec. 9; Continental Ins. Co. v. Board of Fire Underwriters, 67 Fed. Rep., 310; People v. Sheldon, 139 N. Y., 251; Nash v. Page, 80 Ky., 539; Budd v. New York, 143 U. S., 517, 532; Paul v. Virginia, 8 Wallace, 183; Dueber Watch Co. v. Howard Co., 35 U. S. App., 16; Butchers' Union Co. v. Crescent City Co., 111 U. S., 746-62; Allegeyer v. Louisiana, 165 U. S., 578; Hopkins v. U. S., 171 U. S., 603; Sinking Fund Cases, 99 U. S., 700, 747; Printing Co. v. Sampson, L. R., 19 Eq., 465; Nathan v. Louisiana, 49 U. S., ——; 8 Howard, 73; 12 L. ed., 993; State v. Phipps, 50 Kan., 609; s. c. 18 L. R. A., 657; Paul v. Virginia, 75 U. S., ——; 8 Wall., 168; 19 L. ed., 357.

3. The court erred in admitting improper evidence and in excluding proper evidence.

4. The court erred in its instructions to the jury..

5. It was error to render judgment upon the verdict against the defendants.

6. The defendants have been tried, convicted and adjudged to be criminals and deprived of their property without due process of law in violation of the Constitution of the United States.

PADDOCK, WRIGHT & BILLINGS FOR APPELLANTS, GLENS FALLS INS. CO., DELAWARE INS. CO., AND RELIANCE INS. CO. (GEO. L. PADDOCK, JAMES S. PIRTLE, EDMUND F. TRABUE OF COUNSEL.)

1. The indictment was bad for generality and the demurrer should have been sustained because the supposed conspiracy was not described with certainty and particularity required by common law and the Code. Com. v. Ward, 92 Ky., 158, and cases there cited; Crim. Code, secs. 122, 123, 124.

2. Neither the case alleged nor that proved shows an indictable offense. There was no evidence of any unlawful combination. The appellants were held criminally liable for no other acts than such as were lawfully incident to liberties and rights of property guaranteed by the Constitution of the State and that of the United States. The forcible taking by the State from appellants

[ 55 ]

of the amount of money covered by the fines was a deprivation of their property without due process of law, and contrary to the law of the land; it was an exercise of arbitrary power over their liberty and property; it impaired their right of acquiring property and denied to them equality and the equal protection of the laws. Ky. Con., secs 1, 213, *et seq.*, 198; U. S. Con., Amendments, art XIV; Ky. Stats., sec. 3915, *et seq.*, Frorer v. People, 141 Ill., 171; Millett v. People, 117 Ill., 294; Braceville Coal Co. v. People, 147 Ill., 66; Ramsey v. People, 142 Ill., 380; Ritchie v. People, 155 Ill., 98; Eden v. People, 161 Ill., 296; Cooley's Con. Lim. (1st ed.), 391, 393; State v. Goodwill, 33 W. Va., 179; State v. Coal Co,, 33 W. Va., 188; Queen Ins. Co. v. State of Texas, 86 Tex., 250, and cases cited.

In support of argument of the foregoing points, counsel made the following additional citations: Santa Clara County v. S. P. R. R., 118 U. S., 394; Pembina Mining Co. v. Pennsylvania, 125 U. S., 181; Georgia R. R. v. Smith, 128 U. S., 174; Covington Tp. Co. v. Sandford, 164 U. S., 578; Gulf, Colorado & Santa Fe R. R. Co. v. Ellis, 165 U. S., 150; Minnesota, &c., St. L. R. R. Co. v. Minnesota, 134 U. S., 413; Charlotte, &c., R. R. Co. v. Gibbs, 142 U. S., 386; S. L. & S. F. R. R. Co. v. Gill, 156 U. S., 649; Smyth v. Ames, 169 U. S., 522.

S. E. SLOSS AND W. W. THUM FOR APPELLANT, CONTINENTAL INS. CO.

1. The indictment is bad upon two grounds:

(a) Because it is defective in form and wholly insufficient in stating the facts of the alleged offense so as to apprise defendants of the offense charged in order that the judgment therein would be a bar to any other prosecution for the same offense. This is true whether the offense attempted to be described be a criminal conspiracy by statute or at common law; or whether it be such by reason of the object being unlawful or whether by reason of the use of unlawful means in accomplishing the object. Crim. Code, secs. 122, 123, 124; Com. v. Ward, 92 Ky., 158; U. S. v. Walsh, 5 Dillon, 58; March v. People, 7 Barb., 291; Lambert v. People. 9 Cowan, 578; State v. Parker, 43 N. H., 83; State v. Keach, 48 Vt., 118; State v. Roberts, 34 Me., 320; State v. Mayberry, 48 Me., 218; State v. Ripey, 31 Me., 386; Com. v. Wallace, 16 Gray, 221; Com. v. Prius, 9 Gray (Mass.), 127; Wright on Crim. Consp., pp. 205, 211, 257.

(b) The combination of insurance companies for inspection in common and to fix rates of insurance is no criminal offense in Kentucky by common law or by statute, and the indictment does not describe any offense known to the law. Kentucky courts announce that only such rules of the common law of England and

acts of Parliament as are of a general and not local nature to
that kingdom, and were in force prior to 1607, are adopted by
this State and that no rule of the common law not then recog-
nized and in force in England should be recognized and en-
forced there. Lathrop v. Commercial Bank of Scioto, 8 Dana,
121; Ray v. Sweeney, 14 Bush, 2. No case for conspiracy other
than under statute can be found in England prior to 1607, though
it is remarked that a conspiracy to falsely indict a man for
murder would be a conspiracy at common law. The then exist-
ing statutes against combinations to raise wages and to raise
prices of food stuffs, &c., on the way to market have never been
extended beyond their terms, and do not embrace the subject mat-
ter here. There are no conspiracies punishable at common law
except those involving fraud, malice, political conspiracies, con-
spiracies to commit crimes, to maintain false suits and prosecu-
tions, &c. Combinations in the business world in restraint of
trade, etc., while in many cases void as against public policy so
that contracts made in pursuance thereof are not enforceable,
are not unlawful in the sense of being criminal. This is the
substance of the English and American cases, and is supported
by the overwhelming weight of authority. Wright on Criminal
Conspiracies, ch. 1, and notes; History of Criminal Law of Eng-
land, Sir J. S. Stephen, ch. x x x. Mogul Steamship Co. v. Mc-
Gregory, 21 Q. B. D., 455; s. c. 23 Q. B. D., 616; S. C. L. R. App.
Cases, 25. The foregoing authorities review all the common law
authorities and hold that no adjudged case in England holds com-
binations in restraint of trade criminal at common law. Such
never was the law in England before 1607 or since. The Amer-
ican cases are to the same effect. Queen Ins. Co. v. State of
Texas, 86 Tex., 250; s. c. 24 S. W. R., 397; Anheuser-Busch v.
Hauck, 57 S. W. R., 692; Continental Ins. Co. v. Board of F.
Underwriters, 67 Fed. Rep., 313; State v. Lambert Rickey, 4
Halst. (N. J.), 293; Huston v. Reutlinger, 91 Ky., 333; Schulten
v. Bavarian Brew. Co., 96 Ky., 224; Sayre v. Louisville Union,
&c., 1 Duv., 143; Brewster v. Miller's Sons, 19 Ky. Law Rep.,
593; Ky. Wagon Mfg. Co. v. O. & M. Ry., 17 Ky. Law Rep., 726;
Hetterman v. Powers, 19 Ky. Law Rep., 1087; Longshore Print-
ing Co. v. Howard, 26 Ore., 527; Union Pac. Ry. Co. v. Cook, 50
Am. & Eng. R. R. Cases, 89 and note; Ky. Wagon Mfg. Co. v. L.
& N. R. R. Co., 98 Ky., 152; American Fire Ins. Co. v. State of
Miss., 22 Sou. Rep., 103; U. S. v. Addyston P. & S. Co., 85 Fed.
Rep., 271; The following cases based on statutes are not cotnra:
Beechley v. Mullville, 102 Iowa, 602; State v. Phipps (50 Kan.),
18 L. R. A., 657.

2. The Kentucky statute being broader than the common law stat-

utes, and embracing the subject-matter of those statutes, and many other matters besides, and being general in its character, supersedes and substitutes all previous laws existing on the subject of pools, trusts and combinations. Ky. Stats., sec. 3915; Ky. Con., sec. 198; Endlich on Int. of Stats., sec. 203; Com. v. Cooley, 10 Pick., 36, 39; Com. v. Marshall, 11 Pick., 350; State v. Boager, 7 Mo., 631; Towle v. Marret, 3 Greenl (Me.), 22; Broaddus v. Broaddus, 1 Bush, 299; Patterson v. Com., 86 Ky., 313, 318; Smith v. Mattingly, 96 Ky., 228; Buchannon v. Com., 95 Ky., 334; Long, Treas., v. Stone, Auditor, 19 Ky. Law Rep., 246. Also the policy of the State having been fixed by the State (sec. 198 of Constitution), a common law rule, if any ever such existed, will not be pushed beyond that policy.

3. Criminal statutes must be confined to the matters embraced in them, and no one can be deprived of his life, liberty or property by virtue of criminal laws, unless the same be definite, and expressly and clearly embrace the supposed offense charged. L. & N. R. R. Co. v. Com., 18 Ky. Law Rep., 42; Endlich on Int. of Stats., 329 to 339; State v. Powers, 36 Conn., 77; Com. v. Cook, 50 Pa. St., 201; West Union Tel. Co. v. Ackstell, 69 Ind., 199; Lair v. Killman, 25 N. J. L., 522; Philadelphia v. Wright, 4 Phil., (Pa.), 138; U. S. v. Wiltberger, 5 Wheat., 76, 105; Proctor v. Mainwaring, 3 B. & A., 145.

4. The evidence signally fails to bear out the indictment either as to criminal intent, stifled competition or extortionate rates. It was within the power of the Commonwealth if the charges had been true to prove them.

5. The non-board companies not being bound by any agreement to adhere to the scale of rates established by the boards can in no event be held liable to the fines.

6. The subject-matter of insurance can not be likened to the tangible commodities and pre-existing articles within the purview of the statutes of Edward VI., or of the statutes of Virginia, or of the present statutes of Kentucky. It is different by reason of the fact that it relates to the inherent and intangible right to exercise the power and capacity to write indemnity contracts. Moreover unrestrained competition in the sense of producing rate wars between insurance companies is an injury to the public instead of a benefit. Policy holders are interested in having uniform and adequate rates of insurance. Under the modern system of insurance as exercised in the United States, certain reserves are set apart, being proportionate parts of premiums collected, which, according to the results of experience, are deemed sufficient to meet the liability on the risks written, from which those premiums were collected. If an inadequate and in-

Aetna Insurance Co., &c., v. Commonwealth.

sufficient rate be collected by the company, no matter whether forced or brought about by competition or otherwise, this reserve set apart under the statutes would be insufficient to meet the liabilities, and although companies may comply with the letter of the statutes by reserving the statutory proportion of premiums collected, the property owners are thus deprived of the security for which they pay. The capital of insurance companies is a mere margin or guarantee, not to be diminished or impaired under all the State laws. Therefore it is to the reserve that property owners must look to meet the liabilities which may fall upon them and upon the insurance companies, by reason of the risk of fire; in other words, all insurance is of necessity, to a great extent, co-operative.

Moreover, the equitable rating of insurance is a matter which is of the greatest interest to property owners. It should be taken up scientifically, and arrived at by the results of experience, and not by reckless cutting of rates. Experience had demonstrated that there is, after all, a certainty of results in the statistics relating to fire hazards, and that buildings of certain construction and certain kinds under certain conditions are subject to definite percentages of risk, for which, in any proper system of rating, allowances must be made, and the rate fixed accordingly. Constant inspection to keep up. with improvements in buildings and constant adjustments for precautions taken or neglected, are absolutely necessary, and united action on the part of companies, is equally as necessary, not only to save expenses of inspection, which in the end must be borne by the policy holder, but also to arrive at the true rate for any particular piece of property, real or personal, which true rate can not vary, if it be scientifically accurate, but which must be uniform. Thus co-operation both as to inspection and as to rate, which is the necessary result of proper inspection, so far from being injurious, is in the highest degree beneficial to the insuring public.

7. The court erred in the admission and rejection of evidence and giving and refusing instructions.

W. S. PRYOR ALSO FOR THE APPELLANTS.

1. There is no offense charged in the indictment.
2. If an offense had been charged, there is no evidence to support it.
   Citations:   Com. v. Eastman, 1 Cush., 223; U. S. v. Hess, 124 U. S., 486; Lambert v. People, 9 Cowan, 578; 4 Met. (Mass.), 125.

W. S. TAYLOR, ATTORNEY-GENERAL, AND M. H. THATCHER FOR APPELLEE.

1. All conspiracies to do a thing, the end or means of which are unlawful, and all conspiracies to do a wrong affecting the gen-

eral public or an individual thereof, are indictable. 4 Am. & Eng. Ency. of Law, 584; 2 Bishop's Crim. Law, sec. 172.

ROBT. B. FRANKLIN, COMMONWEALTH'S ATTORNEY, ALSO FOR APPELLEE. (W. S. TAYLOR, ATTORNEY-GENERAL, OF COUNSEL.)

1. It is an indictable offense at common law to conspire to do any act, the manifest tendency of which is to affect injuriously the public or any class or body of men. And where a purpose to be accomplished is a manifest injury to the public, the means for its accomplishment need not be specifically stated in the indictment. Ins. Co. v. State., 75 Miss., 24; Anderson v. Jett, 89 Ky., 375; Huston v. Reutlinger, 91 Ky., 333 and cases cited; Stanton v. Allen, 5 Denio, 434; Craft v. McConoughy, 79 Ill., 346; Morris Run Coal Co. v. Barclay Coal Co., 68 Penn. St., 173 and cases cited; Hilton v. Eckersley, 6 Ellis & Black., 47, and cases cited; Arnot v. Pittston, 68 N. Y., 558; People v. Sheldon, 139 N. Y., 251; Judd v. Harrington, 139 N. Y., 105; People of New York v. Milk Exchange, Lmtd., 145 N. Y., 267; Leonard, Recr., v. Pool, &c., 114 N. Y., 371; Stewart v. Erie & W. Transp. Co., 17 Mich., 395; Wright v. Ryder, 36 Cal., 342; People of Illinois v. Chicago Gas Trust Co., 8 L. R. A., 497 and cases cited; Moore v. Bennett, —— Ill., ——; s. c. 15 L. R. A., 361, and authorities cited; King v. De Berenger, 3 Maule & Selwyn, 67; Chitty Crim. Law, vol. 3, p. 1139, and cases cited; Am. & Eng. Ency. of Law; Criminal Conspiracy by Robt. Desty; King v. Journeymen Tailors of Cambridge, 8 Mod. Reps., 10 and cases cited; Queen v. Kenrick, 5 A. & E., 49 and cases cited; King v. Eccles, 3 Doug., 337; Regina v. Parnell, 14 Cox Crim. Cas., 508; Levi v. Levi, 6 Carr. & Payne, 239; Note to Casey v. Cincinnati Typographical Union, No. 3 (45 Fed. Rep., 135), 12 L. R. A., 193; State v. Buchanan, 5 Harris & Johnson, 317; s. c. 9 Am. Dec., 534; State v. Donaldson, 3 Vroom, 151; s. c. 90 Am. Dec., 649; Crump v. Com., 84 Va., 927; s. c. 10 Am. St. Rep., 895; People v. Richards, 1 Mich., 216; s. c. 51 Am. Dec., 75 and note; Mifflin v. Com., 5 Watts & Sergeant, 461; s. c. 40 Am. Dec., 527; State v. Murphy, 6 Ala., 765; s. c. 41 Am. Dec., 79 and cases cited; Com. v. Ward, 92 Ky., 158; Com. v. Ward, 1 Mass., 473; Com. v. Judd., 3 Id., 329; State v. Burnam, 15 N. H., 396; People v. North River Sugar Refining Co., 5 L. R. A., 33; State v. Norton, 23 N. J. L., 40; State v. Phipps, 18 L. R. A., 657; Beachley v. Mulville, et al., 102 Ia., 602; U. S. v. Trans-Missouri Freight Assn., 166 U. S., 290 (41 Lawyers' ed., 1007); Roberson's Ky. Crim. Law and Proced., sec. 94.

2. The indictment complained of in this case alleged specifically a

combination to stifle and kill the effect of free competition in in-
surance rates, and thereby to enable the defendants to extort
from the insuring public large sums of money which they would
not obtain if such competition were not stifled.    Under the
authorities cited under point one, this indictment was sufficiently
specific.

JUDGE DuRELLE DELIVERED THE OPINION OF THE COURT.

This appeal is from a judgment of conviction under an
indictment charging appellants with "the offense of un-
lawfully conspiring, by persuasion, intimidation, and force,
to counteract, avoid, stifle, and kill the effect of free com-
petition among fire insurance companies and agents en-
gaged in and offering to do a fire insurance business in the
city of Frankfort, county of Franklin, and State of Ken-
tucky, committed as follows, viz.:    The said Aetna Insur-
ance Company, a corporation organized under the laws of
the State of Connecticut [and eighty-six others], in the
said city of Frankfort, county of Franklin, and State
aforesaid, on the 22d day of September, 1898, and within
one year before the finding of this indictment, did then
and there, each with the other, and with other persons,
associations, firms, and corporations to this grand jury
unknown, unlawfully conspire, confederate, combine, en-
ter into, maintain, consummate, and continue an unlawful
pool, trust, conspiracy, confederation, combination, com-
pact, and agreement, intending and contriving thereby to
persuade, intimidate, compel, and force all agents and
companies then and there engaged in and offering to do a
fire  insurance business to enter into, maintain, consummate,
and continue said unlawful pool, trust, conspiracy, combi-
nation, confederation, compact, and agreement, the ob-
jects, aim, and ends of which were then and there to
counteract, avoid, stifle, and kill the effect of free compe-
tition among all insurance companies and agents then and

there engaged in and offering to do a fire insurance business,' to fix and maintain the cost of fire insurance to the insuring public at a greater premium rate than would otherwise have to be paid, and thus unlawfully to exact, extort, and procure great sums of money from citizens of this Commonwealth, owning and insuring property in the city of Frankfort, county of Franklin, and State aforesaid, which said great sums of money said citizens would not have to pay but for the existence of said unlawful pool, trust, conspiracy, combination, confederation, compact and agreement, and which said unlawful pool, trust, conspiracy, combination, confederation, compact, and agreement so as aforesaid entered into, consummated, maintained, and continued by the parties aforesaid is of grievous prejudice and hurt to the common and public good and welfare, of evil example, and against the peace and dignity of the Commonwealth of Kentucky."

To sustain this charge of conspiracy, the Commonwealth introduced the Constitution and by-laws. of the Kentucky and Tennessee Board of Fire Underwriters and the Frankfort Board of Underwriters, to show the objects of the associations named, together with evidence that appellants were engaged in fire insurance business at Frankfort through agents who were members of the Frankfort or local board. Not all of the appellants were members of the Kentucky and Tennessee board, but all appear to have done business in Frankfort through members of the board.

The Kentucky and Tennessee board was an association of fire insurance companies doing business in the two States named; the object stated in its constitution being "to organize and maintain local boards, *to establish and enforce uniform commissions, adequate*

*rates,* correct forms of policies, and to inculcate sound principles of underwriting." Each company desiring membership was required to subscribe to the constitution and by-laws through its representatives, "thereby pledging itself to the objects and regulations of the association, and every member of this association shall require its agents to unite with local boards, and to co-operate actively therewith; but *all rules and rates* of the association *must be enforced by members,* whether adopted by the local boards or not." The by-laws require the secretary, "under the direction of the executive committee, to promulgate rates and rules of the association."

The Frankfort board, entitled "The Local Board of Fire Insurance Agents of Frankfort, Kentucky," had for one of its objects, as declared by its constitution, the establishment "and maintenance of adequate and equitable rates." Membership was confined to agents of companies and officers of local companies, and no person was eligible to be a member who was in any way interested in insurance business with a person or company not a member, "unless they also are governed by all the rules and rates adopted by the board." Every member was required "strictly and rigidly to adhere to the rules and rates adopted by the board, without deviation in letter or spirit." By the by-laws, provision was made for an executive and rating committee to survey and report risks. The surveys and rate books issued to members were the property of the board, and returnable upon its order. Misrepresentation or improper means of interference by agents subjected the party offending to charges. No agent was allowed to employ a solicitor or broker. Members were forbidden to attempt to create or foster prejudice against the State association, the local

board, or its members.   There were provisions against
dividing commissions, and writing risks outside the juris-
diction of the board at less than the established rate at
the locality of the risk.   Obedience to these regulations
was to be enforced according to a schedule of penalties
fixed in the by-laws, and members were to be punished for
violation of rules or rates by suspension from member-
ship, after hearing, upon a two-thirds vote, followed by a
request to the companies of such agent that his commis-
sion be cancelled.

Testimony was introduced tending to show that a con-
siderable increase had taken place in the rate of insurance
in Frankfort and vicinity after the establishment of these
boards.   It is not necessary here to go further into the
testimony.

A number of questions are presented upon this appeal,
and have been most elaborately argued by counsel.

Among other grounds for reversal presented, it is urged
that under the ruling in Com. v. Ward, 92 Ky., 158. [17
S. W., 283], the indictment did not sufficiently set forth
the facts stating the offense attempted to be charged;
that the evidence was insufficient to sustain the charge;
that this was especially true as to the so-called non-
board companies, which were not members of either board,
and against whom the only testimony connecting them
with the alleged conspiracy is the fact that they employed
agents in Frankfort who were members of the local board,
thereby adopting the rates promulgated by that board;
that the service of summons upon the Insurance Commis-
sioner was not sufficient to bring the defendants before
the court to answer an indictment; and that the instruc-
tions did not present the law to the jury.

But   the   underlying question,   which,   if   answered

in the negative, renders the consideration of these questions unnecessary for the disposition of this case, is whether, either by the common law or under the statute, there is in this Commonwealth such an offense as that attempted to be described in the indictment. This question we shall consider first.

It was conceded by counsel representing the Commonwealth, both in oral argument and brief, that this proceeding was not instituted under the statute, but under the common law; and a careful examination of the statute has convinced us that it does not apply to a case like the one at bar. It provides (Kentucky Statutes, section 3915):

"That if any corporation under the laws of Kentucky, or under the laws of any other State or country, for transacting or conducting any kind of business in this State, or any partnership, company, firm, or individual, or other association of persons, shall create, establish, organize, or enter into, or become a member of, or a party to, or in any way interested in any pool, trust, combine, agreement, confederation or understanding with any other corporation, partnership, individual or person, or association of persons, for the purpose of regulating or controlling or fixing the price of any *merchandise, manufactured articles or property of any kind*, or shall enter into, become a member of, or party to, or in any way interested in any pool, agreement, contract, understanding, combination or confederation, having for its object the fixing, or in any way limiting the amount or quantity of any article of property commodity or merchandise to be produced or manufactured, mined, bought or sold, shall be deemed guilty of the crime of conspiracy, and punished therefor as provided in the subsequent sections of this act."

The language used would indicate that the statute was intended to prevent pools and trusts forming for the purpose of fixing the price of merchandise and manufactured articles. Without giving undue weight to the argument that the punctuation shows the word "property" to be qualified by the adjective "manufactured," it seems certain that the *ejusdem generis* rule of construction does apply, and that property referred to in the section was property of the same general class or nature as that described previously by the words "merchandise and manufactured articles." And while it may be admitted that a contract, either for labor, or for indemnity against contingent loss, like an insurance contract, when executed, becomes property, because it is then a chose in action, the right to enter into such contracts, which belongs to all persons capable of contracting,—as well natural persons as artificial ones authorized by their organic law to make such contracts,—would hardly be considered to be included by the word "property," unless that word were used in a much broader sense than it is customarily used by lawyers or in statutes. We conclude, therefore, that the word "property," as used in the statute, does not include the right to enter into a contract of insurance, nor to fix the terms upon which such a contract will be made.

This brings us to consider whether, by the common law, as adopted into the jurisprudence of Kentucky, the acts whereof appellants have been charged constitute an indictable offense. And we should inquire further whether the English common law, at the time of its importation into our system, contained a principle which, by natural growth and expansion to meet the needs of social progress in a civilized State, has so enlarged its original scope as to include those acts in the catalogue of public offenses.

On behalf of the Commonwealth it is contended with great ability and fervor that criminal conspiracies —that is, conspiracies that were indictable at common law—included three classes: First, conspiracies to do an unlawful or indictable thing; second, conspiracies to accomplish a lawful purpose by means which were themselves unlawful or indictable; and, third, conspiracies to do a wrong affecting the general public, or an individual thereof, though neither the acts done to accomplish the end, nor the end itself, would be in themselves indictable, but for the conspiracy. Perhaps as clear and compact a statement of the Commonwealth's contention as can be given is to be found in an extract from the article by Mr. Robert Desty on Criminal Conspiracies, in the American and English Encyclopedia of Law:

"A criminal conspiracy is (1) a corrupt combination (2) of two or more persons, (3) by concerted action to commit (4) a criminal or an unlawful act; (a) or an act not in itself criminal or unlawful, by criminal or unlawful means; (b) or an act which would tend to prejudice the public in general, to subvert justice, disturb the peace, injure public trade, affect public health, or violate public policy; (5) or any act, however innocent. by means neither criminal nor unlawful, where the tendency of the object sought would be to wrongfully coerce or or oppress either the public or an individual. . . . It is the corrupt agreeing together of two or more persons to do, by concerted action, something unlawful, either as a means or an end, that constitutes a criminal conspiracy. The unlawful thing must either be such as would be indictable if performed by one alone, or of a nature particularly adapted to injure the public or some individual by reason of the combination.

It is not necessary, in order to constitute a conspiracy, that the acts agreed to be done should be acts which, if done, would be criminal. It is enough that they are wrongful; that is, amount to a civil wrong. . . .

"Every conspiracy to do an unlawful act, or to do a lawful act for an illegal, fraudulent, malicious, or corrupt purpose, or for a purpose, which has a tendency to prejudice the public in general, is an indictable offense, regardless of the means whereby it is to be accomplished."

2 Bishop on Criminal Law, section 172, is to substantially the same effect: "Conspiracy is the corrupt agreeing together of two or more persons to do by concerted action something unlawful, either as a means or as an end. The unlawful thing must be such as would be indictable performed by one alone, or, not being such, be of a nature particularly adapted to injure the public or some individual by reason of the combination."

Relying upon these text writers, and upon the expressions of courts in a number of adjudged cases, the Commonwealth urges that fire insurance, in the progress of civilization, has grown to be an every day necessity; that a combination to prevent free competition among those engaged in the business is against public policy; that, at common law, all combinations to raise the cost of necessaries were indictable, and therefore this combination is indictable here.

Considerable argument on the other side is devoted to the attempt to show that the combination here complained of is not only not obnoxious as against public policy, but a positive benefit to the public, since by the maintenance of adequate rates it secures

the companies bound by it against doing business in a manner which might render them insolvent, and thereby cause loss to the policyholders.   This argument, which is plausible, if not convincing, need not be here considered.

In this State the law seems to be well-settled that agreements in restraint of trade or commerce are so far against public policy as to be illegal, in the sense of being void and not enforceable.   Anderson v. Jett, 89 Ky., 375, [12 S. W., 670].

In Huston v. Reutlinger, 91 Ky., 333, [15 S. W., 867], it was held that an association of underwriters almost exactly similar to the ones now in question, organized "for the purpose of securing uniformity in the rates of premiums, harmony in ' the conditions of insurance," etc., was void, in so far as it undertook to regulate the employment of solicitors, the time of employment, and the compensation to be paid. And while there are decisions on the subject holding that the business of insurance, as carried on in one State by a company incorporated in another, was not commerce between the States (Paul v. Virginia, 75 U. S., 8 Wall., 168; State v. Phipps, 50 Kan., 609, [34 Am. St. R., 152, 18 L. R. A., 657, 31 Pac., 1097]), and in which it has been held that a dealer in foreign exchange was not engaged in commerce, but merely in supplying an instrument of commerce (Nathan v. Louisiana, 49 U. S., 8 How., 73), this court seems to have had no difficulty in holding that a combination in restraint of the exercise of the right to contract for labor was against public policy, and an agreement to be bound by the rules of such combination was void.

We shall assume, therefore, that under the cases of Anderson v. Jett and Huston v. Reutlinger, *supra*, and Sayre

v. Louisville Union Benevolent Association, 1 Duv., 143, [85 Am. Dec., 613], the agreement whereby appellants and their agents became members of the association mentioned was against public policy and void, in so far as it restrained or prevented free competition in the fire insurance business, and shall proceed to consider whether such a combination was an indictable offense by the common law as we obtained it, or included within the spirit of the common-law doctrine as to criminal conspiracies.

In Lathrop v. Commercial Bank, 8 Dana, 121, in an opinion by Chief Justice Robertson, this court, construing the question of how far the common law of England was adopted by Kentucky, said that only such principles of the common law as had been adjudicated before the fourth year of James I. had been adopted in Kentucky. The history of the adoption is given as follows:

"By an ordinance of 1776, Virginia adopted 'the common law of England, and all statutes or acts of Parliament made in aid of the common law prior to the fourth year of James I., and which [were] of a general nature and not local to that kingdom.'

"And the eighth section of the sixth article of the Constitution of Kentucky adopted, with certain qualifications, all laws which on the 1st of June, 1792, were in force in the State of Virginia.

"Unless the British mortmain acts were in force in Virginia on the 1st of June, 1792, they have never been in operation in Kentucky. Virginia had never, prior to June, 1792, specially enacted any mortmain statute; and, therefore, if the mortmain acts of England prior to the 4th of January were all 'local to that kingdom,' no part of them was ever in force in either Virginia or Kentucky."

In Ray v. Sweeney, 14 Bush, 2, [29 Am. R., 388], in an opinion by Judge Cofer, the court said:

"By an act of the Virginia convention of 1776, it was 'declared that the common law of England, all statutes or acts of Parliament made in aid of the common law *prior to the fourth year of King James I.*, and which are of general nature, and not local to that kingdom ·. . . shall be the rule of decision, and shall be considered in full force, until the same shall be altered by the legislative power of this colony." (Morehead & Brown, Kentucky Statutes, 612.)

The present Constitution provides, and previous Constitutions, in substance, provided, that "all laws which on the first day of June, 1792, were in force in the State of Virginia, and which are of a general nature, and not local to that State, and not repugnant to this Constitution, nor to the laws which have been enacted by the General Assembly of the Commonwealth, shall be in force in this State until they shall be altered or repealed by the General Assembly."

"But only such principles and rules as constituted a part of the common law prior to the fourth year of the reign of James I. are, or ever were, in force in this State. This is clearly implied in the act of 1776. To declare that the common law and statutes enacted prior to that time should be in force was equivalent to declaring that no rule of the common law not then recognized and in force in England should be recognized and enforced here.

"James I. ascended the throne of England in 1603 (March 24th), and the fourth year of his reign commenced March 24, 1607; and when it is sought to enforce in this State any rule of English common law, as such,

[ 56 ]

independently of its soundness in principle, it ought to appear that it was established and recognized as the law of England prior to the latter date."

What, therefore, was the common law as to criminal conspiracies in the year 1607?

In Mr. Wright's admirable little book upon the Law of Criminal Conspiracies (section 1), it is said:

"There appears to be no evidence that during the first of these periods [A. D. 1200 to 1600] any other crime , or conspiracy or combination was known to the common law than that which was authoritatively and 'finally' defined in A. D. 1305 by the ordinance of conspirators (33 Edw. I.), as consisting in confederacy or alliance for the false and malicious promotion of indictments and pleas, or for embracery or maintenance of various kinds. During the reigns from that of Edward III. to the end of that of Elizabeth, various statutes were directed against combinations for treasonable purposes or for breaches of the peace, against combinations by merchants to disturb the markets or prices, and against combinations by masons and carpenters, by victualers to raise prices, and by laborers to raise wages or alter hours; but no mention has been found in any of the writers, reports, or abridgements of the period before the seventeenth century of any kind of conspiracy, confederation, or combination, as being criminal at common law, except the crime of conspiracy as defined by the ordinance of 1305. The process by which this specific offense has been expanded into the comprehensive title of conspiracy or combination in the modern criminal law is now to be traced."

The author then proceeds to trace the expansion of the criminal law of England in this behalf until it "grew into a rule that a combination to commit or procure the com-

mission of any crime was criminal, and might be pros-
ecuted as a conspiracy, although the crime might have
nothing to do with the crime of conspiracy, properly so-
called." He ascribes the principal share in the earlier
stages of this development to the Court of Star Chamber.

Speaking of this book, Sir James Fitzjames Stephens,
eminent alike as judge and law writer, says in the thirtieth
chapter of his magnificent History of the Criminal Law
of England:

"Mr. R. S. Wright, in a work of remarkable learn-
ing and ability, collected and commented, with a
special view to this particular subject, upon every case ever
decided upon the subject of conspiracy. The matter has
also been fully discussed in many other works. The re-
sult is that the following statement as to the result of the
authorities upon the subject may be depended upon:

"(1) No case has ever been cited in which any person
was, for having combined with others for the rais-
ing of wages, convicted of a conspiracy in restraint of
trade at common law before the year 1825. There is, in-
deed, one case (that of the journeymen tailors of Cam-
bridge) which may perhaps be an authority the other way,
but this appears doubtful.

"(2) There are some dicta to the effect that
such combinations would be unlawful. The most
important of these is the *dictum* of Grose, J., in
Rex v. Mawbey [6 Term R., 636]: 'In many cases an
agreement to do a certain thing has been considered as the
subject of an indictment for a conspiracy, though the
same act, if done separately by each individual without
any agreement among themselves, would not have been il-
legal,—as, in the case of journeymen conspiring to raise
their wages, each may insist on raising his wages if he

can, but, if several meet for the same purpose, it is illegal, and the parties may be indicted for a conspiracy.' This *dictum* is an illustration not necessary to the decision of Rex v. Mawbey, and founded, as it seems to me, upon the case of the Cambridge tailors.

"(3) 'Some traces may be found in the ancient books of a doctrine that it may be criminal, independently of combination, for one man to oblige another, by bond or otherwise, to abstain from the exercise of his proper craft or employment.' These traces, however, are very faint, though it is clear enough that the attempt to create monopolies by royal grants, or by the by-laws made by bodies corporate or the like, or to restrain people by contract from exercising their trade, were always held to be illegal, except under certain limitations which do not affect this matter, in such a sense as to be void."

The result of the examination of the English cases is thus summarized in Stephen's remarkable book:

"Such, for the present, is the final result of the long history which I have been relating. It is one of the most characteristic and interesting passages in the whole history of the criminal law.

"First, there is no law at all, either written or unwritten. Then a long series of statutes aim at regulating the wages of labour, and end in general provisions preventing and punishing, as far as possible, all combinations to raise wages. During the latter part of this period an opinion grows up that to combine for the purpose of raising wages is an indictable conspiracy at common law. In 1825 the statute law is put upon an entirely new basis, and all the old statutes are repealed, but in such a way as to countenance the doctrine about conspiracies in restraint of

trade at common law.  From 1825 to 1871 a series of cases are decided which give form to the doctrine of conspiracy in restraint of trade at common law, and carry it so far as to say that any agreement between two people to compel any one to do anything he does not like is an indictable conspiracy, independently of statute."

In the volumes of Wright and Stephen, all the English cases cited on behalf of the Commonwealth are considered and discussed, and it is very conclusively shown that prior to 1607 there was no such thing at the common law as criminal conspiracy, except the confederacy for the false and malicious promotion of indictments and pleas, or for embracery or maintenance of various kinds, and that whatever may have been the *dicta* of the judges who decided subsequent cases, or the deductions drawn therefrom by some of the text writers, the cases themselves, for more than 200 years thereafter, do not support the contention made on behalf of the Commonwealth.

There were a large number of statutes against forestalling, 'engrossing, regrating, and badgering, and a very large number against combinations of laborers and artisans to raise their wages. Some of the latter class were not formally repealed until the year 1875.  Of this system of statutes Stephen says:

"I should not myself describe it as a system specially adapted and designed to protect freedom of trade.  The only freedom for which it seems to me to have been specially solicitous is the freedom of the employers from coercion by their men."

The English cases cited on behalf of the Commonwealth are all discussed in the works referred to, and shown not to sustain appellee's contention.

In the case of Mogul Steamship Co. (Steamship Co. v. McGregor, 21 Q. B. Div., 549,) there was a

confederation of steamship companies, united to drive their rivals out of the carrying trade between England and China. The question for decision was whether the federation constituted a conspiracy at common law, as being in general restraint of trade, and of particular injury to certain individuals and to the general public. The opinion in the Queen's Bench division was delivered by Lord Coleridge. Subsequently, in the appeal division of the Queen's Bench, reported in 23 Q. B. Div., 616, the opinion was delivered by Bowen, Lord Justice. It was subsequently decided in the House of Lords. The opinions of the judges on the first hearings, and those of the various law lords upon the final appeal, present a very complete review of all the English cases. Not to occupy too much time in their consideration, it may be remarked that the language of Crompton, J., in Hilton v. Eckersley, 6 Ellis and Blackburn, 47, relied on for appellee, was disapproved, Lord Halsbury saying in his opinion:

"I am unable to assent to that *dictum.* It is opposed to the whole current of authority. It was dissented from by Lord Campbell and Chief Justice Erle, and found no support when the case in which it was said came to the Exchequer Chamber, and it seems to me contrary to principle."

In the opinion of Lord Bramwell in the House of Lords, the doctrine was thus stated:

"I think, upon the authority of Hilton v. Eckersley and other cases, we should hold that the agreement was illegal; that is, not enforceable by law. I will assume then, that it was, though I am not quite sure. But that is not enough for the plaintiffs. To maintain their action on this ground, they must make out that it was an

offense, a crime, a misdemeanor. I am clearly of the opinion it was not. Save the opinion of Crompton, J., (entitled to the greatest respect but not assented to by Lord Campbell or the exchequer chamber), *there is no authority for it in the English law.*" We think it unnecessary to go further in an examination of the English cases upon this subject. The opinions in the Mogul Steamship Case in themselves form a treatise upon the subject, and a very complete discussion of practically all of the English cases upon it.

It is evident from this examination that at the time the English common law, and the English statutes of a general nature, became a part of our system, the acts charged as an offense in this case were not indictable.

Nor do we think that any such principle has been adopted generally by the States of this Union as would justify us in holding, in the absence of all precedent to that effect in this State, that the acts charged are criminal.

We do not consider it necessary to go into an extended review of the American cases upon this subject, but we shall refer to a few of them.

In Hutchins v. Hutchins, 7 Hill, 107, Chief Justice Nelson, in an elaborate opinion, in which the English cases are reviewed at length, said:

We think, therefore, that associations may be entered into, the object of which is to adopt measures that may have a tendency to impoverish another (that is, to diminish his gains and profits), and yet, so far from being criminal, the object may be highly meritorious and public-spirited. The legality of such an association will therefore depend upon the means to be used for its accomplishment. If it is to be carried into effect by fair or honorable and lawful means, it is, to say the least,

innocent; if by falsehood or force, it may be stamped with the character of conspiracy."

To the same effect, see Carew v. Rutherford, 106 Mass., 14.

In a carefully considered opinion in the case of United States v. Addyston Pipe & Steel Co., 29 C. C. A., 141, [85 Fed., 278],—a case arising under the Federal Statute,—Judge Taft, in discussing the statute, said:

"Contracts that were in unreasonable restraint of trade at common law were not unlawful, in the sense of being criminal, or giving rise to a civil action for damages in favor of one prejudicially affected thereby, but were simply void, and were not enforced by the courts. Mogul Steamship Co. v. McGregor [1892] App. Cas., 25; Hornby v. Close, L. R., 2 Q. B., 153; Lord Campbell, C. J., in Hilton v. Eckersley, 6 El. & Bl., 47, 66; Hannon, J., in Farrer v. Close, L. R., 4 Q. B., 602, 612. The effect of the act of 1890 is to render such contracts unlawful, in an affirmative or positive sense, and punishable as a misdemeanor, and to create a right of civil action for damages in favor of those injured thereby, and a civil remedy by injunction in favor of both private persons and public against the execution of such contracts and the maintenance of such trade restraints."

And see Orr v. Home Mutual Insurance Co., 12 La. Ann., 255, [68 Am. Dec., 770]; Macauley v. Tierney, 19 R. I., 255, [61 Am. St. R., 770, 33 Atl., 1]; Longshore Printing Co. v. Howell, 26 Or., 527, [28 L. R. A., 424, 38 Pac., 547].

In the view we have reached as to this case, it is immaterial to discuss the cases which have arisen under more or less stringent statutes in a number of the States, of which Queen Ins. Co. v. Texas, 86 Tex., 250, [22 L. R.

A., 490, 24 S. W., 397], upon the one side, and State v. Phipps, 50 Kan., 609, [34 Am. St. R., 152, 18 L. R. A., 657, 31 Pac., 1097], upon the other, are fair examples.

There are some cases, it is true, where it seems to have been held that a combination to injure another in his business or reputation constituted an offense or afforded a cause of action. In these the element of malice seems to have been relied on. Toledo, A. A. & N. M. Ry. Co. v. Pennsylvania Co., 54 Fed., 738; Casey v. Typographical Union 45 Fed., 135.

We must not be mistaken as intimating that contracts in restraint of trade, or which prevent a contracting party from accepting employment from or giving it to whomsoever he may desire, are not illegal, in the sense of being void as against public policy. That such contracts are unenforceable is settled law in this State, and in most of the States of the Union. Indeed, the bulk of quotations from adjudged cases given in the very ingenious brief of counsel who represented the Commonwealth upon the trial are from cases where this was the question for decision. This is notably the case in his quotations from Anderson v. Jett and Huston v. Reutlinger, decided by this court. It is true that in Com. v. Ward, 92 Ky., 158, [17 S. W., 283], the court—misled, doubtless, by similar loose expressions in the text writers—used this language:

"A criminal conspiracy is a corrupt combination of two or more persons by concerted action to do an unlawful act, or an act not unlawful by unlawful means, or an act which would tend to prejudice the general public."

But the latter clause of the sentence quoted was not at all necessary to the decision of the case then before the court, and must be considered as *dictum.*

We are not able, from a consideration of the cases de-
cided in this State, to reach the conclusion that the doc-
trine as to criminal conspiracies to be deduced from the
common law and statutes recognized in England prior to
4 James I. has exhibited any such growth in this State as
to include any offenses not then cognizable. On the con-
trary, the tendency in this State in one respect, at least,
has been in the other direction.

The statutes of Edw. VI., adopted in 1552, were, at the
time we got our common law, in full force
against forestallers and regraders. But, notwith-
standing the English law had been adopted, by
which it was unlawful to buy goods on their way to
market; to contract to buy them before they came to
market; to make any motion, by word, letter, message, or
otherwise, to any person for the enhancing of the price
or dearer selling of any goods; to buy up dead victuals
of any kind in one market in order to sell them at a high-
er price later at the same place, or within four miles,—
it was found necessary in Virginia to adopt statutes
against forestalling and ingrossing food, in order to ob-
tain provisions for the Revolutionary army.

Even more marked has been the progress, or,
rather, retrogression, in relation to labor unions.
At the time we adopted the English law, the
statutes passed in the time of the sixth Edward
were in full force, which forbade all conspiracies
and covenants of artificers, workmen, or laborers not
to make or do their work but at a certain price or rate,
under the penalty, on a third conviction, of the pillory
and the loss of an ear, and to be taken as a man infam-
ous. There were also in force at that time, unless super-
seded by the elaborate act of fifth Elizabeth, the statute

of 3 Hen. VI., providing that, "whereas by the yearly congregations and confederacies made by the masons in their general chapters and assemblies the good course and effect of the statutes of laborers be openly violated and broken," the chapters should not be holden, those that caused them to be assembled and holden should be "judged by felons, and punished by imprisonment, fine and ransom." The statute of Elizabeth referred to fixed the hours of work; required all persons able to work, and not possessed of independent means or other employment, to labor on demand; gave power to the justices to fix the rate of wages; and forbade any one to set up or exercise any craft, mystery, or occupation unless he had served an apprenticeship of seven years.

But, so far as we are informed, the right of workingmen to combine for an increase or maintenance of their wages by lawful means has never been held unlawful in this Commonwealth. The statutes of Henry, Edward, and Elizabeth upon that subject, so far as the Kentucky authorities show, have always been as dead as they were in England after the act of 1875.

Says Mr. Bishop (2 Criminal Law, section 233):

"Whatever the language of some of the old cases, no lawyer of the present day would hold it indictable for men simply to associate to promote their own interests, or especially to raise their wages. If the means adopted were mutual improvement of their mental or physical powers, mutual instruction in their methods of doing their work, mutual inquiring and imparting information as to the wages paid in other localities, or any thing else of a like helpful nature, severally enabling the members to obtain higher wages, nothing could be more commendable, and nothing further from the inhib-

ition of the law; or, if employers should combine simply to reduce wages, not proposing any unlawful means, perhaps we might not so much commend them, yet still they would stand under no disfavor from the law,—the result of which is that a conspiracy to enhance or reduce wages is not indictable *per se*, while yet it may be so, by reason of proposed unlawful means."

And this has been the doctrine recognized in this State. In Schulten v. Bavarian Brewing Co., 96 Ky., 224, [28 S. W., 504], this court said that it was "not unlawful for several persons in trade to confederate together to protect themselves by lawful acts from dishonest debtors."

In Sayre v. Louisville Union Benevolent Association, 1 Duvall, 145, referring to a New York case, the court said:

"It seems to have been held [in New York] that combinations of workmen to raise their wages are necessarily injurious to trade or commerce and indictable as misdemeanors. . . .

"It seems to be doubtful whether either of these positions is correct. It is entirely consistent with the interests of the public that labor shall be fairly rewarded. If the employer of a number of workmen should refuse to pay them fair wages, why may they not, if bound by no contract, combine for the purpose of obtaining reasonable prices for their labor? We do not perceive that the public would be injured by it, nor any principle upon which it can be condemned as illegal."

See, also, Brewster v. Miller's Sons, 19 Ky. L. R., 593, [41 S. W., 301], citing Bowen Manufacturing Co. v. Hollis, 54 Minn., 223, [40 Am. St. R., 319, 55 N. W., 1119].

And in Hetterman v. Powers, 19 Ky. L. R., 1087, [43

S. W., 180], in an opinion by Judge Hazelrigg, this court distinctly recognized the doctrine that a laborers' union, formed for the purpose of maintaining wages, might be protected in the use of a label indicating that manufactured goods had been made by members of the union.

We conclude that by the common law of Kentucky it is not an indictable offense to combine for the purpose of maintaining rates of insurance.

One other question should perhaps be decided, as necessary to determine what order shall be entered in the circuit court as to the foreign insurance companies when the case goes back. That is the sufficiency of the service of summons upon the Insurance Commissioner. By the statute (Kentucky Statutes, section 631), foreign insurance companies are required to file with the Commissioner a resolution "consenting that service of process upon any agent of such company in this State, or upon the Commissioner of Insurance of this State, in any action brought or pending in this State, shall be a valid service upon said company."

Section 11 of the Criminal Code provides: "A public offense, of which the only punishment is a fine, may be prosecuted by a penal action in the name of the Commonwealth of Kentucky. . . . The proceedings in penal actions are regulated by the Code of Practice in civil actions." Section 9 provides: "All public offenses may be prosecuted by indictment, except offenses of public officers," etc. Chapter 3 of the Criminal Code, on the subject of "Process upon Indictments," provides, in section 147: "The summons shall be issued and served in the same manner as a summons in civil actions."

It is urged that as the consent goes no further than to make the service upon the Commissioner sufficient in an ac-

tion, civil or penal, it can not be extended to an indictment, because the action is within the consent given by the company, and the indictment is not.

But we think these statutes, though they might have been better expressed for the purpose, were intended to apply to exactly this class of cases, and to make valid service upon the Commissioner of summons on a misdemeanor indictment, and give jurisdiction of such prosecutions to the Franklin Circuit Court.

For the reasons given, the judgment is reversed, with directions to sustain the demurrer to the indictment.

Guffy, J., dissents, except from that part of the opinion as to service upon the commissioner.

The whole court considered this case.