[Civ. No. 12429.  First Dist., Div. Two.  Mar. 25, 1943.]

MELLIE MILLSAP, Plaintiff and Appellant v. NATIONAL FUNDING CORPORATION OF CALIFORNIA (a Corporation), Defendant and Appellant.

774

Ralph H. Lewis for Plaintiff and Appellant.

Elmer P. Bromley, H. E. Lindersmith, Frank E. Carleton and Rowland & Craven for Defendant and Appellant.

DOOLING, J. pro tem.—Plaintiff filed a complaint in four counts. On the first count plaintiff had judgment for $865, and from that portion of the judgment defendant appeals. Judgment of nonsuit was entered on the other three counts and from that portion of the judgment plaintiff appeals. The two appeals will be separately considered.

## Defendant's Appeal.

The judgment for plaintiff was one for damages for wrongful discharge from employment. The complaint alleged that in consideration of plaintiff giving up an existing employment at $90 per month defendant agreed to employ her for a reasonable length of time at a beginning wage of $100 per month, to be increased at the end of two months to $110, and that she was discharged without cause in violation of this agreement. The trial court found in favor of plaintiff and found two years to be a reasonable period of employment. The damages were calculated on this basis.

While the complaint alleged and the trial court found a contract of employment for a reasonable period, plaintiff's evidence showed a promise of permanent employment. Since the greater includes the less, we note this fact only to clarify the discussion of the evidence and the points of law presented on the appeal.

Defendant claims: 1. That the evidence does not support the finding that it agreed to give plaintiff employment for a reasonable length of time; 2. That an agreement for permanent employment is in law only an agreement for indefinite employment terminable at the will of either party; 3. That the surrender by plaintiff of her previous position was not a consideration sufficient to support a contract for permanent employment; and 4. That the finding that plaintiff was discharged without cause is not supported by the evidence.

While the evidence on the first point is somewhat conflicting both plaintiff and the witness Chilcott, who employed plaintiff for the defendant, testified that plaintiff told Chilcott that she would not change her position unless she was given permanent employment, and plaintiff testified expressly: "Q. Was anything said at the time about the extent of your employment? A. It was to be a permanent job." This evidence supports the finding attacked.

Questions 2 and 3 may well be considered together. While the Supreme Court in *Lord* v. *Goldberg*, 81 Cal. 596 [22 P. 1126, 15 Am.St. Rep. 82], used language indicating that a contract for permanent employment is in legal effect only a contract for indefinite employment terminable at the will of either party, the later cases of *Seifert* v. *Arnold Bros., Inc.*, 138 Cal.App. 324 [31 P.2d 1059]; *Brown* v. *National*

*Electric Works,* 168 Cal. 336 [143 P. 606] and *Davidson* v. *Laughlin,* 138 Cal. 320 [71 P. 345, 5 L.R.A. N.S. 579], make it clear that a contract for permanent employment based upon sufficient consideration is enforceable according to its terms and may not be terminated at the will of the employer without good cause.

■ The courts in other jurisdictions while generally recognizing the rule stated in these later California cases (135 A.L.R. 654) have arrived at divergent conclusions as to whether the giving up of other employment, business or profession is sufficient consideration to support a contract for permanent employment. Cases holding such consideration sufficient are collected in 135 A.L.R. 669 et seq. and cases *contra* in 135 A.L.R. 671 et seq. The precise question has not been squarely passed upon in California.

In view of the recognized definition of consideration, codified in section 1605 Civil Code, which makes any prejudice suffered or agreed to be suffered by the promisee as an inducement to the promisor, which the promisee is not legally bound to suffer, good consideration for a promise, it is hard to follow the reasoning of those cases from other jurisdictions which hold that the giving up of other employment cannot afford sufficient consideration for a promise of permanent employment. Where the prospective employee clearly states to his prospective employer, as in the case before us, that he will not give up his present employment unless the prospective employer will agree to give him permanent employment and the prospective employer expressly agrees to those terms, it seems clear that the prospective employee (to paraphrase the language of section 1605 Civil Code) in giving up his present employment suffers a prejudice as an inducement to the promisor for his promise of permanent employment. "It is not necessary to the existence of a good consideration that a benefit should be conferred upon the promisor. It is enough that a 'prejudice be suffered or agreed to be suffered' by the promisee." (6 Cal.Jur. 171.) We therefore hold that there was sufficient consideration for the promise of permanent employment (construed by the court in this case as employment for a reasonable period) in accord with the rule laid down in the following cases: *Alabama Mills* v. *Smith,* 237 Ala. 296 [186 So. 699]; *Carnig* v. *Carr,* 167 Mass. 544 [46 N.E. 117, 57 Am.St.Rep. 488, 35 L.R.A. 512]; *Kirkley* v. *F. H. Roberts Co.* 268 Mass. 246 [167 N.E. 289]; *Roxana Petroleum*

*Co.* v. *Rice,* 109 Okla. 161 [235 P. 502]; *Weber* v. *Perry,* —— S.C. —— [21 S.E.2d 193]; *Riefkin* v. *E. I. DuPont, etc. Co.,* 290 F. 286; *Littell* v. *Evening Star etc. Co.,* 120 F.2d 36; *Fletcher* v. *Agar Mfg. Corp.,* 45 F.Supp. 650.

■ The trial court found that defendant "without any cause whatsoever excepting its arbitrary will" discharged plaintiff. The witness Chilcott testified that plaintiff's work was not satisfactory and that she was discharged for that reason. On cross-examination, however, he testified that at the time plaintiff was discharged he told her that defendant had adopted a new policy and was replacing women cashiers (the position held by plaintiff) by men; and he further testified that except for this policy "she would possibly have been discharged, I don't know." Plaintiff testified that at the time of her discharge no complaint was made that her services had not been satisfactory. The evidence supports the finding that the discharge was arbitrary and not for good cause.

*Plaintiff's Appeal.*

Count 2 of the complaint sounded in fraud. No argument as to count 2 is presented by plaintiff and we are entitled to assume that as to that count the judgment of nonsuit was proper.

By count 3 plaintiff seeks the recovery of notary fees received by plaintiff and allegedly paid by her to defendant under duress and coercion. Count 4 is a common count for money received and is only an alternative statement of the cause of action set out in count 3.

On these counts if the trial judge after weighing the evidence had given judgment for defendant on the merits such judgment would have found ample support in the evidence, but on an appeal from a judgment of nonsuit the question is not whether there is sufficient evidence to support a judgment on the merits for the defendant. The question is rather whether there is any evidence which would support a judgment on the merits for plaintiff. This is so because on a motion for nonsuit the judge may not resolve conflicts or draw inferences unfavorable to plaintiff, but must accept as true all evidence, and indulge all reasonable inferences most favorable to plaintiff's case. (9 Cal.Jur. 551.) In stating the evidence therefore we will set out only that most favorable to plaintiff, disregarding all conflicts and possible unfavorable inferences.

█ It appears from the testimony that defendant is engaged in the business of lending money. In 1939 by the adoption of the Personal Property Brokers Act and the Small Loan Act the Legislature put a limitation upon the charges that could be made by lenders in making loans covered by those two acts. Defendant prior to the enactment of these two measures had been in the habit of giving a Christmas party in Los Angeles for its employees at defendant's expense and of giving its employees who had been with it for a certain period a bonus of one month's salary at that time. The witness Shoop, who is attorney for and secretary of defendant, testified that in 1940 defendant was unable to do this because it did not have the money, "the company had just changed over from the old brokerage set up into the new Personal Property Brokers Act—they were formerly under the old set up, whereas the situation on the bonus—as long as you have asked for it—the corporation, whenever they wrote a contract under the old brokerage set up made the base of the note the entire amount of the loan plus the estimated charges . . . when the new Personal Property Broker Act went into effect, the law was radically modified to the extent no brokerage charges would be imputed in effect, except for the purpose of making equal monthly payments."

The Small Loan Act and the Personal Property Brokers Act, while limiting the charges on loans with the effect on the earnings of defendant indicated by the quoted testimony of Mr. Shoop, did allow defendant to collect notary fees actually paid to the notary. (Stats. 1939, pp. 2886, 2893, Deering's Gen. Laws, 1939 Supp., Act 7700; Stats. 1939, pp. 2874, 2882, Deering's Gen. Laws, 1939 Supp., Act 5825(2d).) Prior to the effective dates of these statutes plaintiff, who was a notary public, had done notarial work for defendant without extra compensation. When these statutes went into operation defendant began to collect notary fees from its borrowers pursuant to the authority of the statutes in question. By the terms of the statutes the collection of these notary fees was illegal unless the fees were paid to the notaries.

The witness Mitchell, who at that time was an assistant manager of one of defendant's offices in the Los Angeles area, proposed to the president of defendant that an employees organization might be formed into which the notaries employed by defendant would pay their notary fees collected for them by defendant, "a change in the law had just taken

place, and I knew that we couldn't collect notary fees, but we were allowed under the law, or the notaries were allowed under the law to charge for their services as notary publics, and if he would allow the notaries to charge for their services . . . and in turn contribute those funds to the general benefit of all the employees . . .'' that the employees association could assume the payment of bonuses and other services for the employees as a whole. The president assented to this proposal and Mr. Mitchell sent out notices calling meetings of the employees. The notices were sent from the general office of defendant and it furnished the stationery and stamps.

Pursuant to such notice a meeting of employees in the Northern California offices of defendant was held in Stockton about January 30, 1940. Mitchell presided and the manager of the office in which plaintiff was employed, Chilcott, was present. According to plaintiff's testimony: "Mr. Mitchell called this meeting to order stating they had these notary checks that had to be turned over to the notaries to endorse over to this association . . . that this association was to be for the benefit of the employees, for sick benefits and bonuses . . . and he give us these checks and said that the by-laws wasn't made up at that time. . . . He gave them out to us, he called out the different notaries' names and passed them out, and someone spoke up and says, 'Supposing they don't sign them?' He says, 'If they don't want to sign them, we will get someone else that will, that will sign it,'— I don't know the exact words, but he meant if we didn't sign it we would be out of a job . . . if we did not sign these checks and turn them over to this Employees Association, that we would be let out, and other notaries would be contacted, they would get other notaries to take their places. Then later on he said, 'Well just try to get out that door without signing them.' ''

Two checks aggregating $797 were given plaintiff at the meeting and she endorsed them in blank and gave them to Mitchell "in order to have permanent employment with the company." After this meeting a check was given to plaintiff each day for her notary fees, endorsed by her to the employee's association and mailed to a Miss Cunningham, a bookkeeper in defendant's Los Angeles office, in self-addressed envelopes furnished for that purpose. This was done at Mr. Chilcott's direction. All the checks were endorsed in the belief

that if the plaintiff did not endorse them she would be discharged.

Defendant apparently does not dispute the fact that the evidence is sufficient to support a finding of transfer of the checks by plaintiff under duress, or what is called in some of the cases "illegal business compulsion." (17 Am.Jur. 879; 2 Restatement Contracts sec. 492; *Young* v. *Hoagland,* 212 Cal. 426 [208 P. 996, 75 A.L.R. 654] ; *Oswald* v. *City of El Centro,* 211 Cal. 45 [292 P. 1073, 71 A.L.R. 899] ; *Sciasscia* v. *Fredburn Const. Corp.,* 287 N.Y.S. 513; *McCarthy* v. *Steinkellner,* 223 Wis. 605 [270 N.W. 551, 271 N.W. 374].)

Defendant argues: 1. That the evidence is not sufficient to prove that the defendant exercised the duress; 2. That the money having been paid over to the employees association cannot be recovered from defendant; and 3. That in no event can there be a recovery without a prior rescission.

Taking the evidence as a whole, and drawing all reasonable inferences therefrom in favor of plaintiff, the court could have found that Mitchell in making the threats testified to was acting for defendant. The formation of the employees association and its support in greater part by the contribution of notary fees would enable the defendant to keep its employees in general satisfied by the payment of bonuses and other benefits which the defendant could no longer afford to pay by reason of the changes in the law which resulted in a substantial decrease in defendant's earnings. When Mitchell pointed this out to the president of the defendant the president authorized Mitchell to proceed and notices of the organization meeting were sent out at defendant's expense. Fortuitously, although defendant had been collecting fees for notarial services for at least six or seven weeks before January 30, 1940, none of these fees were paid to the notaries. They were retained by defendant until the Stockton meeting and the checks for them appeared in the hands of Mitchell who presided over the meeting and made the threats. Contrastingly thereafter they were paid to the notaries daily. Chilcott, plaintiff's immediate manager, was present, heard the threats and remained silent; and thereafter directed plaintiff to endorse and mail her check for notary fees daily. The evidence is ample, if believed, to support a finding of duress by defendant.

It is also sufficient to support a finding that defendant received the checks from plaintiff as agent for the employees

association. The first checks were delivered to Mitchell endorsed in blank. The employees association was not then completely organized. The later checks were mailed by Chilcott's direction to a bookkeeper of defendant at defendant's head office in Los Angeles. ''Where money is paid to one whose agency is known, and by him paid over to his principal, the agent will be personally liable therefor where the payment is induced by his fraud, mistake, or wrongful act.'' (82 A.L.R. 312; 3 C.J.S. 129; 2 Am.Jur. 265; 2 Restatement Agency, sec. 339(f); Restatement Restitution, sec. 143(c); *Hohn* v. *Peters,* 216 Cal. 406 [14 P.2d 519]; *Stirnus* v. *Adams,* 50 Cal.App. 730 [195 P. 955]; *Bocchino* v. *Cook,* 67 N.J.L. 467 [51 A. 487].)

▆ Defendant's claim that there could be no recovery without a prior rescission is based on the authority of *Bancroft* v. *Bancroft,* 110 Cal. 374 [42 P. 896] and *McDougall* v. *Roberts,* 43 Cal.App. 553 [185 P. 483]. Those were cases in which it was held that damages by way of tort are not recoverable for contracts entered into by reason of duress or undue influence. It is unnecessary to inquire into the soundness of those decisions, although the view expressed by Mr. Justice Garoutte in his dissenting opinion in the Bancroft case (110 Cal. 380), that damages suffered by reason of duress should be recoverable in a tort action, is supported by respectable authority. (4 Restatement Torts, sec. 871(f); 65 C.J. 32; *Neibuhr* v. *Gage,* 99 Minn. 149 [108 N.W. 884; 109 N.W. 1]; *Smith* v. *Blakesburg Savings Bank,* 182 Iowa 1190 [164 N.W. 762].)

The action here is quasi-contractual, for the recovery of money paid under duress. The fourth count in assumpsit makes this clear. There was no contract to rescind, and no consideration to restore. In such circumstances the courts have allowed a recovery in an action for money received without previous formal rescission. (*Young* v. *Hoagland,* 212 Cal. 426 [208 P. 996, 75 A.L.R. 654]; *Wake Development Co.* v. *O'Leary,* 118 Cal.App. 131 [4 P.2d 802]; *Rowland* v. *Watson,* 4 Cal.App. 476 [88 P. 495]; *McTigue* v. *Arctic Ice Cream S. Co.,* 20 Cal.App. 708 [130 P. 165].)

The judgment in favor of plaintiff is affirmed. The judgment of nonsuit is reversed as to counts 3 and 4 of the com-

plaint and affirmed as to count 2. Plaintiff will recover costs on both appeals.

Nourse, P. J., and Spence, J., concurred.

Defendant and appellant's petition for a hearing by the Supreme Court was denied May 24, 1943. Edmonds, J., and Schauer, J., voted for a hearing.