[Civ. No. 7065. Third Dist. Nov. 1, 1944.]

MELLIE MILLSAP, Respondent, v. NATIONAL FUNDING CORPORATION OF CALIFORNIA (a Corporation), Appellant.

Elmer P. Bromley, H. E. Lindersmith, Frank E. Carleton and Rowland & Craven for Appellant.

Ralph H. Lewis for Respondent.

PEEK, J.—The defendant appeals from a judgment by the trial court in favor of plaintiff after a retrial of certain issues, pursuant to an order of the District Court of Appeal (*Millsap* v. *National Funding Corp.*, 57 Cal.App.2d 772 [135 P.2d 407]).

At the time of the trial the defendant corporation operated in Sacramento under the fictitious name of Seaboard Finance Corporation. Its principal office was located in the city of

Los Angeles. On August 15, 1939, plaintiff went to work at defendant's Sacramento office as a cashier and bookkeeper. Her reasons for giving up her previous position and entering defendant's employment were the assurances of a permanent position at increased salary, a yearly trip to Los Angeles for a Christmas party at defendant's expense, and a bonus which was given annually by defendant to all of its employees. She was qualified as a notary public, and it was understood she was to act in such capacity for the benefit of defendant and its customers. On November 15, 1940, she was discharged.

A few months thereafter plaintiff filed a complaint against the defendant, wherein it was alleged in separate causes (1) that her discharge was a breach of her contract of employment, for which she asked damages in the sum of $4,500; (2) that the defendant fraudulently induced her to pay over to it notary fees in the amount of $3,000; (3) that the defendant unduly influenced her to deliver up the notary fees, to her damage in the sum of $3,000; (4) that the defendant is indebted to the plaintiff in the amount of $3,000 for money received by defendant for the use and benefit of plaintiff.

At the conclusion of that trial plaintiff had judgment on her first count for $865. From that portion of the judgment defendant appealed. Judgment of nonsuit was entered on the other three counts. From that portion of the judgment plaintiff appealed. The district court sustained the judgment in favor of plaintiff on the first count, and further held that the judgment on nonsuit as to count 2 of the complaint, which sounded in fraud, was proper inasmuch as no evidence was presented by plaintiff in support thereof. The judgment of nonsuit as to counts 3 and 4 of the complaint was reversed and the case remanded for retrial on the last two counts. (*Millsap* v. *National Funding Corp., supra.*) At the conclusion of the second trial the court granted plaintiff judgment against defendant in the amount of $2,945, which sum represents the stipulated amount of fees collected by defendant for notary fees performed by plaintiff from December 9, 1939, to November 15, 1940. The present appeal is from that judgment.

On December 9, 1939, the Personal Property Brokers Act (Stats. 1939, chap. 952; Deering's Gen. Laws, 1939 Supp., Act 5825 (1st) ) and California Small Loan Act (Stats. 1939, chap. 1045; Deering's Gen. Laws, 1939 Supp., Act 7700) previously enacted by the Legislature, became effective, placing an

over-all limitation upon the charges which could be made by lenders on loans covered by such acts. The new statutes, while so limiting loan charges, provided that notary fees actually paid to a notary public could be charged to the borrower by the lender. From the last mentioned date defendant instituted the practice of collecting notary fees as an independent charge from its borrowers. The fees so collected by defendant were not immediately paid to the notaries employed by it in its various offices throughout the state but were held by it until the latter part of January, 1940, when a series of meetings of employees of defendant were scheduled. One of such meetings was held at Stockton for the employees of certain Northern California offices, under circumstances which are basis of this action.

John G. Mitchell, who was identified as an assistant branch manager of one of defendant's Los Angeles offices, testified that the meetings were suggested by him to defendant's president as a means of organizing an employees benefit association. Notices of the meetings were sent to defendant's employees through the company's regular mailing system by Mitchell. He also testified that he had made arrangements for the meetings, and although his traveling was done upon company time he paid his own traveling expenses, also all costs of dinners, and that he ultimately was reimbursed out of the association funds for such expenses. Two checks totaling $797 were issued by the defendant to the order of plaintiff representing notary fees which had accrued since December 9th, and were turned over to Mitchell together with other checks, likewise drawn in favor of notaries at other branches for such accrued fees. The total of all checks then held by Mitchell representing notary fees accruing during the seven weeks' period between December 9th and the January meeting amounted to approximately $20,000 or $25,000. This money, according to Mitchell, was to form the nucleus of the benefit fund into which dues in the amount of fifty cents per month would be paid by all employees. He further stated that a trust agreement and by-laws for the proposed organization were read by him to those present at the Stockton meeting. The agreement which appears in the clerk's transcript as an exhibit contains the names of 154 employees including plaintiff. Although it contains provisions relating to the purposes and intent of the association, the ad-

ministration thereof, and a specific provision for payment of monthly dues by the members, no mention whatsoever is made concerning notary fees, the main source of funds.

Plaintiff testified that in response to the request contained in a notice from defendant's main office she, with other employees from the Sacramento office, including the manager, Mr. Chilcott, attended the meeting at Stockton; that during the course of which Mitchell, who was presiding, informed those present that the meeting had been called for the purpose of forming an employees benefit association; that the money obtained from the notaries together with the monthly dues from each employee would be used for a benefit fund, and that with the money so obtained the association would give the annual Christmas party and pay the bonus in the same fashion as the defendant corporation had previously. According to her testimony, when Mitchell gave out the checks to the notaries he requested that they be endorsed in blank and returned to him, and that if the checks were not so endorsed and returned "we would be out of employment; they would get somebody else to take our places"; that he further said in reply to a remark as to what would happen if they were not so endorsed, "Just try and get out of that door if you don't sign them." In reply to a direct question by counsel, "Did he state you would lose your jobs" she replied "Yes."

Her stated reason for endorsing in blank the two checks aggregating $797, which were given to her by Mitchell at the meeting, was that ". . . I would rather have a permanent job. I liked the work and thought I would better sign the checks and keep my job than not to sign them and be out of a position. . . . As long as I had a permanent job, that was what I was working for, and that is what I wanted,—— permanent employment, and that is the reason I signed them over by the threat that if I didn't I would be out of employment."

The plaintiff further testified that after the Stockton meeting a check was given to her each day for notary fees; that upon the instructions of Mr. Chilcott, the local manager, she had no alternative but to endorse the checks to the employees association and mail the same to the defendant's Los Angeles office in a self-addressed envelope furnished for that purpose, together with the regular interoffice mail. Chilcott, however, categorically denied any such instructions; that to the contrary on one or two occasions he told her the checks

were hers and that he never told her she had to send them in. His testimony in this regard was denied by the plaintiff.

By stipulation the testimony of one Byron W. Harry given at the previous trial was read into the record now before us and discloses that he was an insurance adjuster for defendant; that he was present at the meeting in Stockton; that Mr. Mitchell explained that an employees association was being organized; that out of the monies obtained from the notary fees the employees were to receive certain benefits from the association including the usual bonus at Christmas time plus the employees' expenses to Los Angeles and return for the annual Christmas party; that Mitchell stated the employees association was in the process of being organized and that he had checks from the company made out to the various notaries for fees which had accumulated since the new act had gone into effect; that when the question was asked, "supposing notaries don't want to endorse these checks," Mitchell replied that "those that did not want to cooperate, there would be arrangements made to get employees that would cooperate" and that when the checks were passed out Mitchell made the further statement "Don't anyone try to get out of that door without signing these checks."

In reply to such testimony the witness Mitchell could not recall whether or not he told plaintiff and the other notaries that they could have the money if they wanted it. He admitted, however, he had said in effect, "these words about not signing them [the checks], 'but try to get out. There are plenty here who are interested in those checks', who wouldn't want them to do that . . .''; and that he made such statement in a joking manner. In reply to a further question by counsel, did you not also tell the notaries present that if they didn't sign "you would get some one who would cooperate," he replied, "In effect what I said was this: That any notary who wasn't in favor of it that I was sure the individual branches would be more interested in getting a new notary in the office so they could benefit from the Notary's earnings; some notary who would cooperate."

Sidney A. Shoop, an attorney at law and secretary-treasurer of defendant corporation, testified that after a new act went into effect the company "had inaugurated the practice of getting these Notary fees which we put into a separate account until we completed our transitions"; that when

Mitchell approached the directors with his idea concerning an employees association he was told to go ahead but that the company could not give the suggestion any particular time then, and that there was no discussion about the association taking over the Christmas party until possibly August, 1940. However, he testified that he was present at the employees' meeting in Los Angeles and heard Mitchell tell the employees that they would get a Christmas bonus out of the association, but that he did not recall if Mitchell told them they would get a vacation from the fund as well. He further stated that the employees did hold the next Christmas party and that bonuses were given out. He also stated that in view of the "loss of income" because of the new act there would be "several months in which the Company was operating at a loss,—— over a period of a couple of years it would build up back to where it was—— but at that time the directors didn't feel it would be a good business venture or policy to give a Christmas bonus."

The defendant now contends (1) that there is no evidence to support the finding of fact that the defendant exercised duress upon the plaintiff; (2) that the finding that notary fees were paid by plaintiff to the defendant is unsupported by the evidence; (3) that the finding that the defendant received such fees as trustee for the use and benefit of plaintiff and ever since has continued to hold such fees as trustee is unsupported by the evidence; (4) that there was no duress practiced upon plaintiff by the defendant; (5) that plaintiff cannot recover such fees because they constitute a portion of the consideration given by her for a permanent contract of employment by defendant and for the breach of which she has already been given damages; (6) that the fourth cause of action is merely a statement of the third cause of action.

Defendant's first complaint that there is no evidence to support the finding that the defendant exercised duress upon the plaintiff, and its fourth complaint that there was no duress practiced upon plaintiff at any time, should be considered together, for it must be admitted if the record discloses sufficient evidence to show defendant's first contention to be without foundation, then the fourth must likewise fall.

An examination of the record reveals substantial evidence in support of the findings but little, if any, which is not in conflict. Such conflicts are disclosed in the testimony of defendant's witness Mitchell and the testimony of the plaintiff

and her witness Harry concerning the threatening statements of Mitchell at the Stockton meeting, and the subsequent acts of Chilcott, plaintiff's immediate superior, in directing her to endorse and mail daily all checks for notary fees to defendant's main office in Los Angeles. To this evidence should be added the testimony relating to the circumstances surrounding the withholding of all notary fees until the Stockton meeting; the delivery of the checks to Mitchell by the defendant in order that the checks might be personally presented by him at that time while all the other employees were present, and the daily payment of the fees thereafter.

The words used by the district court in the previous case in summarizing the evidence of duress which was before it (and which was to the same general effect as that which appears in the record before us) might well be adopted as the conclusion of this court upon the first and fourth issue: "The evidence is ample, if believed, to support a finding of duress."

It is well established that an appellate court, in reviewing the evidence before it, must resolve all conflicts in favor of the respondent and indulge in all inferences to support the judgment. (*Crawford* v. *Southern Pacific Co.* (1935), 3 Cal.2d 427, 429 [45 P.2d 183]; *Estate of Bristol*, 23 Cal.2d 221, 223 [143 P.2d 689].) Applying such rule to the present case it cannot be said that the findings so attacked do not find ample support in the evidence.

We find no merit in defendant's second contention which is based upon what is stated to be uncontradicted evidence, that the notary fees paid by defendant to plaintiff were transmitted by her voluntarily to the employees association, which in turn used the fees for the purposes of that organization, and that defendant benefited in no way thereby. From such statement defendant concludes that the findings attacked are legally impossible. By such argument defendant completely ignores all evidence either directly or indirectly, contrary to the testimony which we have previously mentioned and directly bearing upon this question. Defendant further ignores the additional findings and the ample evidence in support thereof, that through fear and undue influence exerted upon her by the defendant, the plaintiff endorsed and delivered the checks for notary fees to defendant. The rule stated as authority for our holding in regard to the first issue raised by defendant is likewise a complete answer to this issue as well.

██ In regard to the third issue it has raised defendant argues that the trial court in making the findings that it did must have acted upon the theory that the association was the agent for defendant for the purposes of accumulating and collecting the notary fees, and that such a conclusion could have been reached only by indulging in inferences. It is then argued that as the evidence is uncontradicted in regard to the creation and management of the employees association and the handling of the notary fees any inference which might have existed is dispelled as a matter of law, citing *Engstrom* v. *Auburn Auto. Sales Corp.*, 11 Cal.2d 64 [77 P.2d 1059]. As a generality such statement is correct, but defendant has failed to consider the qualification of a rule which is also set forth in the Engstrom case. The Supreme Court therein further observed that to rebut an inference the evidence must be "clear, positive and uncontradicted . . . not open to doubt . . . [and] if the opposition evidence is conflicting, vague or uncertain or is weakened by contradiction or improbabilities, an inference is not dispelled as a matter of law." It cannot be said the evidence disclosed by the record is *clear, positive, uncontradicted* and *not open* to doubt or that defendant's evidence in opposition to that of plaintiff is not *conflicting, vague* or *uncertain.*

██ In reviewing the evidence and the finding so attacked this court likewise should indulge in "all legitimate and reasonable inferences . . . to uphold the verdict if possible . . . [and] when two or more inferences can be reasonably deduced from the facts, the reviewing court is without power to substitute its deductions for those of the trial court." (*Crawford* v. *Southern Pacific Co.*, p. 429, *supra.*) The rule thus quoted is as applicable in reviewing the findings of the judge as it is in considering a verdict of the jury. (*Estate of Bristol, supra.*)

Again referring to the opinion in the previous appeal in this case, the appellate court in commenting upon a similar question, stated that such evidence, if believed, was "sufficient to support a finding that defendant received the checks from plaintiff as agent for the employees association."

By virtue of the findings and judgment of the trial court in the present case it is obvious that the evidence was believed. Such conclusion is borne out further by the comments of the judge at the conclusion of the trial, when, in summarizing

the evidence which we have previously mentioned, he concluded: ". . . so I think the whole situation points to the fact that the Company had its eyes upon this fund, and figured a way of getting the benefit of it to itself by virtue of this Employees Association."

Defendant's fifth contention that plaintiff cannot recover the fees paid to defendant in that such fees were a part of the consideration of the permanent contract of employment for the breach of which she had received compensation, is based entirely upon a finding of the trial court at the conclusion of the first trial. Such finding was in accordance with the determination of the trial court, which was reversed on appeal. Patently such finding cannot be made the basis of an argument for a reversal of the judgment now before us. Defendant further contends, upon the authority of *Johnson* v. *Hinkel* (1915), 29 Cal.App. 78 [154 P. 487], that courts will not allow a party to recover for the breach of a contract, more than would have been received by due performance.

That the parties considered the contract as severable after the enactment of the statute is amply borne out by the evidence. If this were not so it indeed would be most difficult to understand the acts of defendant in relation to the notary fees from the effective date of the Small Loan Act until plaintiff's discharge.

Surely defendant does not mean, by citing the rule as stated in the Johnson case, *supra,* that the notary fees belonged to defendant, and, if not, to whom, other than plaintiff, did they belong? The conclusion is inescapable that after the passage of the Small Loan Act any fees collected by defendant for services performed by plaintiff could not have been kept by defendant, and were the property of plaintiff. As such, the notary fees were something separate and apart from the damages awarded her at the conclusion of the first trial for the breach of her contract of employment.

The judgment is affirmed.

Thompson, J., and Adams, P. J., concurred.

A petition for a rehearing was denied November 29, 1944, and appellant's petition for a hearing by the Supreme Court was denied December 28, 1944.