[S. F. No. 17196. In Bank. Sept. 20, 1946.]

XUM H. SPEEGLE, Appellant, v. BOARD OF FIRE UN-
DERWRITERS OF THE PACIFIC (an Association)
et al., Respondents.

Edward R. Solinsky, Philip C. Boardman and James F. Boccardo for Appellant.

Robert W. Kenny, Attorney General, Clarence A. Linn, Deputy Attorney General, and Max Radin, as Amici Curiae on behalf of Appellant.

Joseph T. O'Connor, Long, Levit, Cunningham & White, Orrick, Dahlquist, Neff, Brown & Herrington and Bardin & Herrington for Respondents.

O'Melveny & Myers, Louis W. Myers, Allen G. Wright, Randell Larson and Sidney L. Weinstock, as Amici Curiae on behalf of Respondents.

TRAYNOR, J.—Plaintiff brought this action to recover actual and exemplary damages for alleged injury to his business by defendants. The trial court sustained defendants' demurrers to plaintiff's second amended complaint without leave to amend and entered judgment for defendants. Plaintiff appeals.

The following facts are alleged in the second amended complaint: Plaintiff has been an insurance agent in Salinas since 1927, and since 1937 has also done business there as an insurance broker. He entered into written contracts of agency with the 14 defendant insurance companies and with defendant Pennsylvania Underwriters, hereinafter referred to as one of the defendant insurance companies. Defendant insurance companies are all members of defendant Board of Fire Underwriters of the Pacific, an association of fire insurers, hereinafter referred to as the board. In the early part of 1939, the board, acting in concert with defendant Salinas Association of Local Insurance Agents, hereinafter referred to as the agents' association, accused plaintiff of violating his contracts with the members of the board by placing insurance, as agent or as broker, with nonboard companies. Plaintiff states that he placed most of his business with board members but that when the interest of his customers required it, he placed insurance with nonboard companies. He denies that this practice constituted a violation of his contracts with board companies. In March, 1939, following an investigation by the board into plaintiff's practices, defendants caused three of the board companies to terminate their agency contracts with him. In July of that year the board threatened to cause the 12 other board companies to terminate their contracts with plaintiff, unless he immediately ceased to represent nonboard companies and relinquished his broker's license. Upon plaintiff's refusal to comply with these conditions, defendants caused the termination of his remaining contracts with board companies.

Plaintiff also alleges that he entered into the insurance agency and brokerage business in Salinas and made his contracts with defendant companies in reliance upon certain usages of the insurance trade; that under such usages an agency contract is permanent and "will not be cancelled except for good and lawful cause," an agent is under no duty to place all insurance with the company or companies for which he is agent and is free to place insurance with other board and nonboard companies, and is also free to engage in the business of an insurance broker and in that capacity to place insurance with other companies according to the wishes or interests of the applicants.

Plaintiff further alleges that it is the purpose of the board through coercion and oppressive methods, and otherwise, to dominate and control "the class of insurance written by its members . . . fix the terms, conditions and rates for such insurance," determine the terms upon which board members may employ agents, dominate and control the business of such agents and of brokers who act as agents for board members, and by such methods to "limit and restrict and restrain fair competition in said insurance business and as between brokers; and . . . unlawfully to create and carry out restraints and restrictions upon the business and business methods of such agents and brokers and upon fair competition in placing insurance to the best advantage of those who may require or who may desire insurance of the classes written by the . . . members of said Board."

Plaintiff contends that defendants had no right to require him to represent only board companies and relinquish his broker's license; that their conduct amounted to an unjustified interference with his contractual relations and, on the part of defendant insurance companies, to a breach of contract; and that their attempt to dominate or destroy his business was part of a conspiracy to restrain the insurance trade in Salinas. The following questions are thus presented for decision: I. Are defendants liable for breach of contract or interference with plaintiff's contractual relations? II. Has plaintiff properly raised in his pleadings the question of defendants' liability for restraint of trade? III. Has plaintiff stated a cause of action under statutory (Bus. & Prof. Code, §§ 16700 to 16758, known as the Cartwright Act) or common law rules against restraint of trade? IV. Is the Cartwright Act constitutional? V. Does the Sherman Anti-Trust Act preclude the application of state law?

I. Are defendants liable for breach of contract or interference with plaintiff's contractual relations?

█ The complaint does not set forth any of the agency contracts, but pleads them according to their legal effect. As to their duration it merely alleges that in the insurance business such contracts are customarily regarded as being permanent and revocable only for cause. Plaintiff's contention that in terminating the contracts defendant companies committed breaches thereof rests therefore entirely upon that allegation. A contract for permanent employment, however, is only a contract for an indefinite period terminable at the will of either party (*Lord* v. *Goldberg,* 81 Cal. 596 [22 P. 1126, 15 Am.St. Rep. 82]), unless it is based upon some consideration other than the services to be rendered. (*Brown* v. *National Electric Works,* 168 Cal. 336 [143 P. 606]; *Davidson* v. *Laughlin,* 138 Cal. 320 [71 P. 345, 5 L.R.A.N.S. 579]; *Millsap* v. *National Funding Corp.,* 57 Cal.App.2d 772 [135 P.2d 407]; *Seifert* v. *Arnold Bros., Inc.,* 138 Cal.App. 324 [31 P.2d 1059]; see *Otten* v. *Spreckels,* 183 Cal. 252 [191 P. 11].) Since plaintiff has not alleged such consideration, it cannot be concluded that defendant insurance companies violated their contracts with him.

Plaintiff contends, however, that defendants unlawfully interfered with his contracts on the grounds that none of the contracts would have been terminated had the decision rested solely with each insurance company, that the termination of the contracts was brought about by pressure upon the companies brought by the board, assisted by the agents' association, and that each company was influenced by the others acting in concert.

█ Intentional and unjustifiable interference with contractual relations is actionable in California as in most other jurisdictions. (*Imperial Ice Co.* v. *Rossier,* 18 Cal.2d 33 [112 P.2d 631]; see cases collected in 84 A.L.R. 43.) Recognizing that the fact that a contract is "at the will of the parties, respectively does not make it one at the will of others," (*Truax* v. *Raich,* 239 U.S. 33, 38 [36 S.Ct. 7, 60 L.Ed. 131, Ann.Cas. 1917B 283, L.R.A. 1916D 545]) the great majority of the cases have held that unjustifiable interference with contracts terminable at will is actionable. (*Hitchman Coal & Coke Co.* v. *Mitchell,* 245 U.S. 229 [38 S.Ct. 65, 62

L.Ed 260] ; *United States Fidelity & Guaranty Co.* v. *Millonas,* 206 Ala. 147 [89 So. 732, 29 A.L.R. 520] ; *Berry* v. *Donovan,* 188 Mass. 353 [74 N.E. 603, 108 Am.St.Rep. 499, 3 Ann.Cas. 738, 5 L.R.A.N.S. 899] ; *London Guarantee & Acc. Co.* v. *Horn,* 206 Ill. 493 [69 N.E. 526, 99 Am.St.Rep. 185] ; see cases cited in 84 A.L.R. 43, 60; see, also, Prosser, Torts, 981; 1 Callmann, Unfair Competition, § 33.1; Carpenter, *Interference With Contract Relations,* 41 Harv.L.Rev. 728, 742.) Interference with such contracts may be justified under certain circumstances. (*Imperial Ice Co.* v. *Rossier,* 18 Cal.2d 33, 36 [112 P.2d 631.] ; *McGee v. Collins,* 156 La. 291 [100 So. 430, 34 A.L.R. 336] ; *Triangle Film Corp.* v. *Artcraft Pictures Corp.,* 250 F. 981, 982 [163 C.C.A. 231] ; see cases collected in 84 A.L.R. 79; Rest. Torts, §§766-774; Prosser, Torts, 996, 982; 1 Callman, Unfair Competition, § 33.1; Holmes, *Privilege, Intent and Malice,* 8 Harv.L.Rev. 1, 9; Carpenter, *Interference With Contract Relations,* 41 Harv.L.Rev. 728, 745; 30 Am.Jur. 80.) Each company is of course interested in the loyalty of its agents, and, like any other principal, may require an agent to represent it exclusively or to represent only such other principals as have interests in common with it. Collective bargaining, which is an important part of modern employment relations, is carried on in recognition of the fact that employers as well as employees may organize for the purpose of furthering their common interests and that such organizations may bring pressure upon their members to include in their contracts certain terms and conditions or to terminate contracts that do not contain such terms and conditions. (*Bentley* v. *Mountain,* 51 Cal.App.2d 95, 99 [124 P.2d 91] ; *G. S. Smith Met. Market* v. *Lyons,* 16 Cal.2d 389, 400 [106 P.2d 414] ; *Bautista* v. *Jones,* 25 Cal.2d 746, 749, 754, 771, 780 [155 P.2d 343] ; *Parkinson Co.* v. *Bldg. Trades Council,* 154 Cal. 581, 603 [98 P. 1.027, 16 Ann.Cas. 1165, 21 L.R.A.N.S. 550] ; *Exchange Bakery* v. *Rifkin,* 245 N.Y. 260 [157 N.E. 130, 133] ; Rest., Torts, §§ 797-812; see Carpenter, *Interference With Contract Relations,* 41 Harv.L.Rev. 728, 760 and cases there cited.) It does not appear that the conditions sought to be imposed upon plaintiff were not also imposed upon the members of the agents' association. Such members would have a common interest in seeing that he was subjected to the same conditions imposed upon them.

▮ Defendants' activities would be for an unlawful pur-

pose, however, and would therefore not be justified, if their objective was to stifle competition by enforcing a scheme to restrain trade. (Rest., Torts, § 768(c).) The answer to the question whether defendants are liable for interference with plaintiff's contractual relations therefore depends on whether plaintiff has stated a good cause of action against defendants for injury to his business by activities in restraint of trade.

II. Has plaintiff properly raised in his pleadings the question of defendants' liability for restraint of trade?

■ Since the case is before us on demurrer, the allegations of plaintiff's second amended complaint must be regarded as true. ■ Defendants contend that although the second amended complaint alleges that the board was organized to restrain trade it fails to allege that the purpose of defendants' activities against plaintiff was to restrain trade or that plaintiff's alleged injuries resulted from activities in restraint of trade. Plaintiff alleged that the board was organized to "dominate and control to their economic advantage, the class of insurance written by its members . . . fix the terms, conditions and rates for such insurance . . . likewise dominate and control the business and business methods of said agents and of every independent insurance broker who may be acting as an insurance agent for any member . . . of said Board, and by and through such coercion, oppression, domination and control limit and restrict and restrain fair competition in said insurance business and as between brokers . . . and by such coercion and oppression in respect to and domination and control of the classes of insurance written by its members . . . unlawfully to create and carry out restraints and restrictions upon the business . . . of such agents and brokers and upon fair competition in placing insurance to the best advantage of those who may require . . . insurance of the classes written by said members of said Board." Plaintiff's allegation that the board was organized to stifle competition in the insurance field by dominating the business of insurance agents must be read in conjunction with his allegations as to the conditions that defendants sought to impose upon him and his allegation that acceptance of those conditions would have meant domination of his business by defendants. If these allegations are read in conjunction with each other it cannot be seriously questioned that plaintiff's second amended complaint alleged that it was defendants' purpose not merely to injure plaintiff's business, but to dominate that business along with the

business of other insurance agents and brokers and thus to restrain trade in the field of insurance written by board companies. In the light of the facts alleged it is clear that plaintiff traced the injuries inflicted upon his business to his refusal to accept domination of his business by defendants as part of a general scheme pursued by them to restrain trade in the insurance field by dominating the business of insurance agents.

■ Pleadings must be reasonably interpreted; they must be read as a whole and each part must be given the meaning that it derives from the context wherein it appears. (*Jones* v. *Kelly,* 208 Cal. 251 [280 P. 942]; *Hayter* v. *Fulmor,* 66 Cal.App.2d 554, 561 [152 P.2d 746].) ''Allegations must be liberally construed, with a view to substantial justice between the parties.'' (Code Civ. Proc.,§ 452), which is not served when technical forfeitures prevent a trial on the merits. (*Wennerholm* v. *Stanford Univ. Sch. of Med.,* 20 Cal.2d 713 [128 P.2d 522, 141 A.L.R. 1358].)

■ Even if the trial court was of the opinion that plaintiff's second amended complaint was not sufficiently detailed, it abused its discretion in sustaining defendants' demurrers without leave to amend, for a plaintiff who has pleaded the general set of facts upon which his cause of action is based should be given an opportunity to amend his complaint, and should not be deprived of his right to maintain his action on the ground that his pleadings were defective for lack of particulars. (Code Civ. Proc., § 472(c); *Olivera* v. *Grace,* 19 Cal.2d 570, 579 [122 P.2d 564, 140 A.L.R. 1328]; *MacIsaac* v. *Pozzo,* 26 Cal.2d 809, 815 [161 P.2d 449]; *Wennerholm* v. *Stanford Univ. Sch. of Med.,* 20 Cal.2d 713, 719 [128 P.2d 522, 141 A.L.R. 1358]; *Guilliams* v. *Hollywood Hospital,* 18 Cal.2d 97, 104 [114 P.2d 1].)

It must be concluded, therefore, that plaintiff's second amended complaint properly raised the question of defendants' liability for restraint of trade.

III. Has plaintiff stated a cause of action under statutory or common law rules against restraint of trade?

The Cartwright Act (Bus. & Prof. Code, §§ 16700-16758) forbids combinations in restraint of trade and grants a cause of action to any person injured by such a combination. Under section 16726, trusts, as defined in section 16720, are ''unlawful, against public policy and void.'' Under section 16750 any person whose business is injured by such a trust ''may sue

therefor . . . to recover twofold the damages sustained by him, and the costs of suit.''*

■ It cannot be seriously questioned that a combination like the one alleged to have existed between defendants is an unlawful trust under the foregoing provisions. ■ Defendants contend, however, that insurance is not commerce or at least was not so regarded when the Cartwright Act was enacted, and that therefore the act does not apply to combinations in restraint of the insurance trade. It is true that the decision in *United States* v. *South-Eastern Underwriters Association,* 322 U.S. 533 [64 S.Ct. 1162, 88 L.Ed. 1440], in which the United States Supreme Court recently determined that insurance is commerce within the meaning of the Commerce Clause and the Sherman Anti-Trust Act could not change the meaning of the word ''commerce'' as that word is used in the Cartwright Act. It demonstrates, however, that Congress did not intend ''to freeze the proscription of the Sherman Act within the mold of the then current judicial decisions defining the commerce power,'' but intended on the contrary to go to the utmost extent of its power. The Cartwright Act is couched in similarly comprehensive language; it forbids combinations of the kind described with respect to every type of business.

---

*A trust is defined in section 16720 as a '' combination of capital, skill or acts by two or more persons for any of the following purposes:

(a) To create or carry out restrictions in trade or commerce.

(b) To limit or reduce the production, or increase the price of merchandise or of any commodity.

(c) To prevent competition in manufacturing, making, transportation, sale or purchase of merchandise, produce or any commodity.

(d) To fix at any standard or figure, whereby its price to the public or consumer shall be in any manner controlled or established, any article or commodity of merchandise, produce or commerce intended for sale, barter, use or consumption in this State.

(e) To make or enter into or execute or carry out any contracts, obligations or agreements of any kind or description, by which they do all or any combination of any of the following:

(1) Bind themselves not to sell, dispose of or transport any article or any commodity or any article of trade, use, merchandise, commerce or consumption below a common standard figure, or fixed value.

(2) Agree in any manner to keep the price of such article, commodity or transportation at a fixed or graduated figure.

(3) Establish or settle the price of any article, commodity or transportation between them or themselves and others, so as directly or indirectly to preclude a free and unrestricted competition among themselves, or any purchasers or consumers in the sale or transportation of any such article or commodity.

(4) Agree to pool, combine or directly or indirectly unite any interests that they may have connected with the sale or transportation of any such article or commodity, that its price might in any manner be affected.''

It cannot be assumed, therefore, that the Legislature intended to make an exception for insurance in the absence of any indication in the statute to that effect. Morever, it is immaterial whether or not insurance is commerce, for the act makes unlawful combinations designed to increase the price of "any commodity" and to fix the price of "any article or any commodity or any article of trade, use, merchandise, commerce or consumption." It is clear that insurance, being "practically a necessity to business activity and enterprise" (*German Alliance Ins. Co.* v. *Lewis*, 233 U.S. 389, 414 [34 S.Ct. 612, 58 L.Ed. 1011]) has become an indispensable commodity in modern life.

▇ The Cartwright Act merely articulates in greater detail a public policy against restraint of trade that has long been recognized at common law. ▇ Thus, under the common law of this state combinations entered into for the purpose of restraining competition and fixing prices are unlawful. (*Getz Bros. & Co.* v. *Federal Salt Co.*, 147 Cal. 115, 118 [81 P. 416, 109 Am.St.Rep. 114]; *Meyers* v. *Merillion*, 118 Cal. 352, 356 [50 P. 662]; *Endicott* v. *Rosenthal*, 216 Cal. 721, 726 [16 P.2d 673]; *Herriman* v. *Menzies*, 115 Cal. 16, 21 [44 P. 660, 46 P. 730, 56 Am.St.Rep. 82, 35 L.R.A. 318]; *Santa Clara Valley Mill & Lumber Co.* v. *Hayes*, 76 Cal. 387, 393 [18 P. 391, 9 Am.St.Rep. 211]; *Pacific Factor Co.* v. *Adler*, 90 Cal. 110 [27 P. 36, 25 Am.St.Rep. 102]; see, 36 Am.Jur. 579.) The public interest requires free competition so that prices be not dependent upon an understanding among suppliers of any given commodity, but upon the interplay of the economic forces of supply and demand. ▇ Combinations between insurers or insurers and insurance agents for the purpose of stifling competition in the insurance market and fixing insurance rates are clearly in violation of the common law rules against restraint of trade. (*Aetna Ins. Co.* v. *Commonwealth*, 106 Ky. 864 [51 S.W. 624, 45 L.R.A. 355]; *McCarter* v. *Firemen's Ins. Co.*, 74 N.J.Eq. 372 [73 A. 80, 414, 135 Am.St.Rep. 708, 18 Ann.Cas. 1048, 29 L.R.A.N.S. 1194].) Insurance is a matter of such public concern that many states regard the protection afforded the community by statutory or common law rules against restraint of trade as insufficient and have accordingly enacted special statutes against combinations that seek to dominate the field of insurance or have given their insurance commissioners special powers over insurance rates. The enactment of such special legislation signifies there is a

danger of market domination in the insurance field, in which a great number of diversified risks and the accumulation of vast reserves are required of each insurer. "Fire insurance companies, acting together, may have owners of property practically at their mercy in the matter of rates, and may have it in their power to deprive the public generally of the advantages flowing from competition between rival organizations engaged in the business of fire insurance. In order to meet the evils of such combinations and associations, the State is competent to adopt appropriate regulations that will tend to substitute competition in the place of combination or monopoly." (*German Alliance Ins. Co.* v. *Hale,* 219 U.S. 307, 316 [31 S.Ct. 246, 55 L.Ed. 229].) Since there is no such special legislation in California, the Cartwright Act and the common law must be relied upon for the protection of the public against combinations in restraint of the insurance trade.

▆ Courts have recognized that a certain amount of cooperation between insurers is required by the very nature of the insurance business. (*Continental Ins. Co.* v. *Board of Fire Underwriters of the Pacific,* 67 F. 310; *Booker & Kinnaird* v. *Louisville Board of Fire Underwriters,* 188 Ky. 771 [224 S.W. 451, 454, 21 A.L.R. 531]; see *Cline* v. *Insurance Exchange of Houston,* 140 Tex. 175 [166 S.W.2d 677]; *Cline* v. *Insurance Exchange of Houston* (Tex.Civ.App.) 154 S.W.2d 491, 495; *Buffalo Ass'n of Fire Underwriters* v. *Noxsel-Dimick Co.,* 235 App.Div. 92 [256 N.Y.S. 263], aff'd, 260 N.Y. 678 [184 N.E. 142]; *Walker* v. *Fort Worth Ins. Underwriters' Ass'n.* (Tex.Civ.App.) 79 S.W.2d 661.) It does not follow that insurance companies are immune from common law and statutory rules against restraint of trade. The combination complained of in the present case was not merely between insurers but between insurers and an association of their agents; combinations between employers and employees present a particularly effective means of stifling competition. The United States Supreme Court has recently declared that "Congress never intended that unions could, consistently with the Sherman Act, aid non-labor groups to create business monopolies and to control the marketing of goods and services." (*Allen Bradley Co.* v. *Local Union No. 3,* 325 U.S. 797, 808 [65 S.Ct. 1533, 89 L.Ed. 1939]; see, *United States* v. *Borden Co.,* 308 U.S. 188, 204 [60 S.Ct. 182, 84 L.Ed. 181]; 19 So.Cal.L.Rev. 256.)

It must be concluded, therefore, that plaintiff has stated a cause of action not only under common law rules but under the Cartwright Act.

 If the trial court should determine that plaintiff's business was injured by activities in restraint of trade, the question will arise as to how plaintiff's damages should be computed. One whose business has been injured by the activities of a combination in restraint of trade is entitled to damages, not only under the Cartwright Act (Bus. & Prof. Code, § 16750), but also under the common law. (Civ. Code, § 3281, see, cases cited in 36 Am.Jur. 660, n.9.) Since proof of the damages suffered may be difficult, "the wrongdoer may not object to the plaintiff's reasonable estimate of the cause of the injury and of its amount, supported by the evidence, because not based on more accurate data which the wrongdoer's misconduct has rendered unavailable." (*Bigelow* v. *RKO Radio Pictures, Inc.,* 327 U.S. 251 [66 S.Ct. 574, 580, 90 L.Ed. 652].) "The most elementary conceptions of justice and public policy require that the wrongdoer shall bear the risk of the uncertainty which his own wrong has created. . . . That principle is an ancient one . . . and is not restricted to proof of damage in antitrust suits, although their character is such as frequently to call for its application." (*Ibid.*)

IV. Is the Cartwright Act constitutional?

 Defendants contend that the Cartwright Act is unconstitutional. It was so held in *Ward* v. *Auctioneers Ass'n of So. Cal.,* 67 Cal.App.2d 183 [153 P.2d 765]; and *Blake* v. *Paramount Pictures,* 22 F.Supp. 249, on the authority of *Cline* v. *Frink Dairy Co.,* 274 U.S. 445 [47 S.Ct. 681, 71 L.Ed. 1146]. In the latter case the Supreme Court of the United States enjoined the prosecution of several dairy companies under the Colorado Anti-Trust Act, a statute "which is in terms a replica of the Cartwright Act," (*In re Battelle,* 207 Cal. 227, 251 [277 P. 725, 65 A.L.R. 1497]) on the ground that the provisions therein exempting from its operation combinations entered into for the purpose of securing reasonable profits to their members, provided such profits could not otherwise be secured, left the whole statute "without a fixed standard of guilt" and thus rendered it unconstitutional. Although the court did not expressly hold those provisions to be inseparable, it must have regarded them as such in the absence of any decision on the subject by the Supreme Court of Colorado, for it indicated that the statute would have been valid without them. Plaintiff contends, however, that the cor-

responding provisions of the Cartwright Act (Bus. & Prof. Code, §§ 16723 and 16724) are separable from the rest of the act and that he can recover in the present action irrespective of their invalidity. That contention must be sustained. The policy against combinations in restraint of trade underlying the Cartwright Act was not created by that act but had previously been evolved at common law. The act was not intended to change that policy but merely to make its enforcement more effective. It is clear therefore not only that the provisions exempting certain combinations from the operation of the act do not have the same importance as the provisions prohibiting all other combinations in restraint of trade, but also that the act will remain fully intelligible and will effectively serve the purpose for which it was enacted, even though the former provisions are disregarded. Moreover, there is another consideration that leads us to separate the exceptions from the general prohibition. The Cartwright Act, as enacted in 1907, did not include the provisions that rendered the Colorado act unconstitutional, for those provisions were added in 1909. In the Colorado act, however, they were part of the original enactment. Thus, the fact that the Supreme Court of the United States took the position that the invalid provisions were so essential to that statute that it would not have been enacted without them can have no bearing upon the present case, for in the present case the statute was originally enacted without the allegedly invalid provisions. The very court that decided against separability in *Cline* v. *Frink Dairy Co.*, *supra,* would undoubtedly decide in favor of separability in the present case on the authority of *Frost* v. *Corporation Commission,* 278 U.S. 515 [49 S.Ct. 235, 73 L.Ed. 483]. In that case an unconstitutional amendment to a statute of Oklahoma was held separable from the valid provisions sought to be amended, although the court expressly stated that the amendment would have invalidated the original enactment had it been part of that enactment. ''When passed, it (the original statute) expressed the will of the legislature which enacted it. Without an express repeal, a different legislature undertook to create an exception, but, since that body sought to express its will by an amendment which, being unconstitutional, is a nullity and, therefore, powerless to work any change in the existing statute, that statute must stand as the only valid expression of the legislative intent.'' (*Frost* v. *Corporation Commission, supra,* at p. 526.) The same position was taken by this court (*Miller* v. *Union Bank & Trust Co.,* 7 Cal.2d 31 [59 P.2d 1024]) and

is sustained by the overwhelming weight of authority. (See, cases collected in 1 Sutherland, Statutory Construction (3d ed.) § 1937.)

Defendants contend, however, that when the Legislature in 1941 reenacted the Cartwright Act, as amended in 1909, into the Business and Professions Code, it intended that the entire statute be regarded as having been enacted at the same time. It need not be determined whether in that event the 1909 provisions would be inseparable from the 1907 provisions, for plaintiff's cause of action arose in 1939 and the act must be construed as it stood at that time. Moreover, far from expressing the intention suggested by defendants, the Legislature made it clear that the 1907 and 1909 provisions should continue to be regarded as separable. Not only does section 2 of the Business and Professions Code specify that the provisions of that code should be construed as restatements and continuations of similar provisions of existing statutes rather than as new enactments, but section 16701 provides that the separability of the provisions of the Cartwright Act should be determined by "whether the provisions of . . . 1907 and the provisions of . . . 1909 are separable among themselves and as to each other." The 1909 amendment added four provisions to and deleted two words from the original enactment. In order to make it absolutely clear that if the 1909 amendment were invalid, the entire 1907 enactment should stand, the Legislature added a second paragraph to section 16701 in which it specified that, if the two words that it attempted to delete in 1909 were not effectively deleted, it intended them to be part of the act. Defendants point to the difference between section 16701(1) and section 16701(2) and contend that if the Legislature intended to have the entire 1907 enactment stand should the 1909 amendment be invalid, it would have said so expressly as it did in section 16701(2) as to the two deleted words. Section 16701(2), however, was enacted as a precaution to cover two words that do not appear in the text of the amended statute and no similar precaution was needed as to the rest, for, with the exception of those two words, the amended statute includes both the original provisions and those added in 1909. It must be concluded, therefore that the Cartwright Act is constitutional. *Ward* v. *Auctioneers Ass'n of So. Cal., supra,* 67 Cal.App.2d 183, is therefore disapproved.

V. Does the Sherman Anti-Trust Act preclude the application of state law?

When plaintiff filed his second amended complaint the United States Supreme Court had not yet rendered its decision in *United States* v. *South-Eastern Underwriters' Association,* 322 U.S. 533 [64 S.Ct. 1162, 88 L.Ed 1440], that the Sherman Anti-Trust Act applies to interstate insurance transactions. Plaintiff has made no allegations as to whether or not any of the parties was engaged in interstate commerce or whether defendants' alleged activities in restraint of trade affected interstate commerce. Upon the trial of the case it may appear that the case involves interstate commerce and the question would then arise whether plaintiff can sue under the state law and in a state court or whether his exclusive remedy is under the Sherman Act and in the federal courts.

Although the South-Eastern case brought "a reorientation of attitudes toward federal power in its relation to the business of insurance conducted across state lines" (*Prudential Ins. Co.* v. *Benjamin,* 328 U.S. 408 [66 S.Ct. 1142, 1147, 90 L.Ed. 1342, 164 A.L.R. 476]), the United States Supreme Court made it clear that this reorientation did not mean that the states were deprived of jurisdiction to regulate insurance. "It is settled that, for Constitutional purposes, certain activities of a business may be intrastate and therefore subject to state control, while other activities of the same business may be interstate and therefore subject to federal regulation. And there is a wide range of business and other activities which, though subject to federal regulation, are so intimately related to local welfare that, in the absence of Congressional action, they may be regulated or taxed by the states. In marking out these activities the primary test applied by the Court is not the mechanical one of whether the particular activity affected by the state regulation is part of interstate commerce, but rather whether, in each case, the competing demands of the state and national interests involved can be accommodated. And the fact that particular phases of an interstate business or activity have long been regulated or taxed by states has been recognized as a strong reason why, in the continued absence of conflicting Congressional action, the state regulatory and tax laws should be declared valid. . . . Finally it is argued . . . that virtually all the states regulate the insurance business on the theory that competition in the field of insurance is detrimental both to the insurers and the insured, and that if the Sherman Act be held applicable to insurance much of this state regulation will be destroyed. . . . The argument that the Sherman Act

necessarily invalidates many state laws regulating insurance we regard as exaggerated. Few states go so far as to permit private insurance companies, without state supervision, to agree upon and fix uniform insurance rates. Cf. *Parker* v. *Brown*, 317 U.S. 341, 350-352 [63 S.Ct. 307, 87 L.Ed. 315]. No states authorize combinations of insurance companies to coerce, intimidate, and boycott competitors and consumers in the manner here alleged, and it cannot be that any companies have acquired a vested right to engage in such destructive business practices." (*United States* v. *South-Eastern Under-writers' Association, supra,* pp. 548, 549, 562.) The view that the South-Eastern Underwriters case does not invalidate state laws in the insurance field in absence of conflicting action by Congress was reiterated in *Prudential Insurance Co.* v. *Benjamin, supra,* and *Robertson* v. *California*, 328 U.S. 440 [66 S.Ct. 1160, 90 L.Ed. 1366]. As stated in the Prudential case: "State laws are not invalid under the Commerce Clause unless they actually discriminate against interstate commerce or conflict with a regulation enacted by Congress." (66 S.Ct. 1142, 1150, note 22.) In order to "give support to the exist-ing and future state systems for regulating and taxing the business of insurance" (*Prudential Ins. Co.* v. *Benjamin, supra,* 66 S.Ct. 1142, 1155) Congress enacted the McCarran Act. (59 Stats. 34, c. 20; 15 U.S.C.A. §§ 1011-1015.)*

---

*Section 1011. "Congress declares that the continued regulation and taxation by the several States of the business of insurance is in the public interest, and that silence on the part of the Congress shall not be construed to impose any barrier to the regulation or taxation of such business by the several States."

Section 1012. "(a) The business of insurance, and every person en-gaged therein, shall be subject to the laws of the several States which relate to the regulation or taxation of such business.

(b) No Act of Congress shall be construed to invalidate, impair, or supersede any law enacted by any State for the purpose of regulating the business of insurance, or which imposes a fee or tax upon such business, unless such Act specifically relates to the business of insurance: *Provided*, That after January 1, 1948, sections 1-7 of this title, and sections 12-27, 44 of this title, section 412 of Title 18, sections 381-383, 386-390a of Title 28, and sections 52 and 53 of Title 29, and sections 41-46 and 47-58 of this title, as amended, shall be applicable to the business of insurance to the extent that such business is not regulated by State law."

Section 1013. "(a) Until January 1, 1948, sections 1-7 of this title and sections 12-27, 44 of this title, section 412 of Title 18, sections 381-383, 386-390a of Title 28, and sections 52 and 53 of Title 29, and sections 41-46 and 47-58 of this title and sections 13-13b, and 21a of this title, shall not apply to the business of insurance or to acts in the conduct thereof.

(b) Nothing contained in this chapter shall render sections 1-7 of this title, inapplicable to any agreement to boycott, coerce, or intimidate, or act of boycott, coercion or intimidation."

This act clearly recognizes the interest of the states in the regulation of insurance. "The McCarran Act, is, in effect, a determination by Congress that the business of insurance, though done in interstate commerce is not of such a character as to require uniformity of treatment within the distinction taken in the doctrine of *Cooley* v. *Port Wardens*, 12 How. (U.S.) 299 [13 L.Ed. 996], except as otherwise expressly declared." (*Prudential Ins. Co.* v. *Benjamin*, *supra*, p. 1156, note 39.) In order to allow time for Congress and the state Legislatures to consider legislation with regard to activities in restraint of trade in the field of insurance, the applicability of the Sherman Anti-Trust Act and other pertinent federal statutes is suspended by the act until January 1, 1948. (H. Rep. No. 143, 79th Cong. (1st Sess.), p. 3.) While this suspension makes it clear that in the meantime state law applies to restrictions upon competition in the insurance trade, the Sherman Act remains applicable with respect to restraints of competition involving boycott, coercion, or intimidation. The fact that the Sherman Act is applicable to such practices does not mean that the state law concerning restraints of commerce in the insurance trade is invalidated as to activities and agreements involving such practices. The key to an understanding of the provision of the McCarran Act reserving the applicability of the Sherman Act with regard to the practices referred to lies in the statement of the United States Supreme Court in the South-Eastern Underwriters case that no state authorizes combinations of insurance companies to coerce, intimidate or boycott competitors and consumers. By declaring the Sherman Act applicable to such practices the McCarran Act prevents the states during the moratorium from authorizing such practices in conflict with the Sherman Act. Since there is no conflict between the law of this state and the Sherman Act, plaintiff may invoke the state law even if interstate commerce is involved.

The judgment is reversed.

Gibson, C. J., Shenk, J., Edmonds, J., Carter, J., Schauer, J., and Peters, J. pro tem., concurred.

Respondents' petition for a rehearing was denied October 17, 1946. Shenk, J., voted for a rehearing.