[Civ. No. 15004. First Dist., Div. One. June 25, 1952.]

FRANK J. REED, Respondent, v. BEN E. GARFINKLE, Appellant.

Philip Steiner and Webb, Webb & Steiner for Appellant.

A. Brooks Berlin, Alvin A. Lobree and Neil Cunningham for Respondent.

WOOD (Fred B.), J.—Defendant has appealed from a judgment which rescinded and canceled three agreements executed by the parties in June and July, 1946, and awarded plaintiff $5,500 plus interest to the date of the judgment, and his costs of suit.

The trial court found: (1) April 25, 1946, plaintiff at defendant's solicitation commenced negotiations for the purchase of defendant's general insurance agency business for the price of $25,000, plaintiff paying defendant $500 on May

2, $2,000 on May 16, and $3,000 on July 1, 1946, on account of the purchase price. (2) June 29, 1946, the parties executed a written agreement as of July 1, for the purchase of a one-half interest in defendant's business for $12,500 payable in installments, the parties agreeing they would enter into a partnership agreement, which latter agreement was executed July 16, as of July 1, for a period ending January 2, 1947, plaintiff to have the management of the business and on January 2, 1947, to buy defendant's remaining one-half interest for $11,-250 payable in installments, that in the latter part of July the parties executed a supplemental agreement stipulating that defendant was not required to devote more time to the partnership than necessary to give his advice and administrative assistance and that in view of defendant's not taking any of the profits of partnership operations plaintiff would hold him clear and harmless from all obligations of the partnership; that the agreements of sale and of partnership were executed as part of one entire transaction for the purchase and ultimate acquisition by plaintiff of defendant's entire insurance agency business, the partnership being formed for the purpose of permitting plaintiff to hold and obtain the benefit of the business of the companies represented by the agency, which could be better accomplished by defendant's continuing endeavors to that end and continued identity in the business for six months. (3) It was orally agreed between the parties that plaintiff would require 30 to 60 days to arrange to take over the management and operation of the business, delivery of which by mutual consent was effected August 17, 1946. (4) Prior to the execution of this agreement, defendant represented to plaintiff (a) that the business to be sold consisted principally of a general insurancy agency business for Merchants Fire Insurance Company, Halifax Insurance Company, and Mid-States Insurance Company; (b) defendant was a general agent for these three companies; (c) that the business done for Mid-States Insurance Company would be particularly beneficial because the company was writing casualty insurance as distinguished from fire insurance written by the other two companies and plaintiff could rest assured that the agency for Mid-States would be retained and plaintiff should have no concern in that regard; (d) for plaintiff's benefit and during the partnership and a reasonable period thereafter, defendant would utilize his identity and render his efforts to the retention of the general agency business being sold, particularly the general agency for the three companies

mentioned; (e) all accounts owed by defendant to said companies up to July 1, 1946, would be adjusted and paid in full at the time plaintiff would take over management and operation; (f) that each of said three companies had at all times been thoroughly satisfied with the results achieved by defendant in their behalf and that the business done by his agency for each during the period of their accounts had been transacted at a profit to each company and there had been no complaints by any of the companies or any disputes or differences between them and said agency respecting the manner in which the agency business was being conducted or the results obtained by said agency for them; (g) defendant would immediately take the necessary steps to have plaintiff appointed agent of said companies and to file with the State Insurance Commissioner documents evidencing such appointments, in order that plaintiff after taking over the management could legally carry on the business of said companies; and (h) defendant would personally introduce plaintiff to various local agents doing business for the agency being sold, would do so after plaintiff's taking over the management of the agency. (5) All of said representations were made by defendant solely for the purpose of inducing plaintiff to purchase defendant's agency business, execute the agreements of sale and of partnership and part with the payments on account of the purchase price, and for other valuable considerations. (6) Said representations were false and fraudulent and were known by the defendant to be false and untrue when made. (7) The facts respecting these representations were (a) February 8, 1946, Merchants Fire Insurance Company canceled its general agency contract with defendant, effective April 15; plaintiff had no knowledge thereof when he executed the agreements; because of this cancellation plaintiff never received any business for or on behalf of said company; (b) prior and subsequent to the execution of said agreements a controversy existed between Merchants Fire Insurance Company and defendant respecting a certain credit taken by him; prior to and for many months after execution of said agreements, defendant was indebted to said company in respect to his account for May and June, 1946, all of which was known to defendant, unknown to plaintiff, and concealed by defendant; (c) said company canceled because of the high loss ratio of business developed by defendant during preceding years, a fact concealed from plaintiff; (d) subsequent to execution of the agreements, defendant at all times failed and neglected: (i) to take any

steps to introduce plaintiff to any of the representatives of said three insurance companies or to apprise them of these agreements with plaintiff and never had any intention of fulfilling any of his promises in regard to such matters; (ii) to take any steps toward procurement of a license from the state, licensing plaintiff to act as agent for the companies represented by defendant's agency, or to appoint or have plaintiff appointed agent for any of such companies, and defendant never had any intention to take such steps; and (iii) to introduce plaintiff to any of defendant's various [local] agents and defendant never had any intention of fulfilling his promises in that regard. (8) Plaintiff relied solely, absolutely and in good faith upon said representations and executed the three agreements with defendant and made the purchase price payments in sole reliance upon said representations and each of them. (9) In the latter part of July, 1946, plaintiff discovered that the business did not include any agency for the Merchants Fire Insurance Company and immediately notified defendant he could not carry out the transaction for the full amount of the agreed purchase price. (10) Between August 17 and September 3, 1946, plaintiff discovered that said company had canceled its agency contract with defendant because of the high loss ratio developed by defendant over a period of several years. (11) Between August 17 and September 3, 1946, (except as otherwise found by the court) plaintiff for the first time discovered the falsity of the representations mentioned in clause (4), above, and on or about September 3 notified defendant that by reason of the falsity of those representations plaintiff was released from making further purchase price payments and demanded the return of the $5,500 already paid. (12) At defendant's request negotiations for settlement of the rights and duties of the parties ensued until about November 21 when defendant notified plaintiff that further settlement negotiations were terminated and plaintiff would be held responsible for the purchase price payments, which liability plaintiff disclaimed and continued to demand the return of the $5,500. (13) At defendant's request plaintiff continued the management of the agency business pending the outcome of negotiations, subsequent to the termination of which and on December 10, 1946, plaintiff served on defendant a notice of rescission of the agreements and demanded return of the $5,500. (14) In addition to the false and fraudulent representations and conduct hereinabove specified, defendant during

the entire period of the partnership conducted himself in relation to the partnership as follows: (a) when plaintiff took over the management of the business defendant represented he had credits due from Merchants Fire Insurance Company and requested plaintiff to pay defendant on account thereof, representing that any such payments could be recovered from the company in the adjustment of current accounts with the company, and plaintiff relying solely and in good faith upon the truth of such representations paid defendant, in August, 1946, from general agency accounts $1,879.27 and the sum of $1,356.86 for expenses allegedly incurred by defendant in connection with said business; that, instead, defendant, to his own knowledge, was indebted to the company on his accounts for May and June, 1946, and a controversy then existed between him and the company concerning the same; that by reason of the foregoing plaintiff was never able to obtain any credits from that company and the company held up payments of all credits otherwise due the partnership and applied them to the indebtedness of defendant to the company; (b) about August 8, 1946, Mid-States Insurance Company notified defendant of cancellation of its agency contract with him, effective September 9, 1946; defendant for the fraudulent purpose of inducing plaintiff to take over management of the business and to make the payments mentioned in subclause (a), above, concealed the fact of such cancellation until August 17, or shortly thereafter; if plaintiff had known of such cancellation when made, he would not have taken over management of the business, nor would he have made said payments to defendant; (c) in spite of repeated requests by plaintiff, defendant during the partnership agreement, to the date of formal rescission, failed, neglected and refused to deliver to plaintiff any and all agency contracts, correspondence, documents or other records between the companies represented by the general insurance agency and defendant. (15) After receipt of said notice of rescission, defendant for a valuable consideration transferred to third parties the assets of said general agency business, receiving approximately $5,261 therefor, plaintiff having no knowledge or notice of said transaction until after the commencement of this action, which transfer defendant made and consummated for his sole use and benefit and thereby ratified and accepted the rescission of the agreements executed by plaintiff and defendant in June and July, 1946. (16) Solely by reason of defendant's false and fraudulent representations and de-

fendant's conduct, the carrying on of the partnership agreement was seriously impaired and prejudiced and at the time of the formal notice by plaintiff was at a standstill; on or about December 19, 1946, the Halifax Insurance Company served defendant with notice of cancellation of its agency contract with defendant. (17) Plaintiff received nothing of value from defendant pertaining to the agreements of June and July, 1946, and no compensation out of the business; there has been a material failure of consideration for plaintiff's obligations under the agreements and consideration for such obligations has wholly failed.

These findings of fact are amply supported by the evidence, including the testimony of the plaintiff and that of Jack Piver who, engaged by defendant to find a purchaser of the business, found the plaintiff, brought the parties together and on behalf of defendant participated in some of the negotiations.

In support of his appeal, defendant presents a number of points which we will consider in the order in which he presents them.

■ (1) Defendant claims that plaintiff did not rely upon defendant's representations but made his own independent investigation of the business; that plaintiff retained an expert insurance accountant, Bell, who examined the books of the business, defendant placing at the disposal of plaintiff and the accountant every record and document asked for. That accountant, however, testified he did not audit defendant's books, was not asked to do so; was not employed to do so; that he went over the trial balance, making a cursory examination without pay; that the trial balance indicated that the three principal companies of the agency were still being actively represented; that the loss ratios of those companies could not be determined from the books of the general agency; that he was not informed by defendant that Merchants Fire Insurance Company had canceled, and defendant told plaintiff and Bell it would not be necessary for Bell to contact the companies. Plaintiff testified that he completely relied upon the truthfulness of the representations made by defendant and defendant's agent and by reason thereof was induced to execute the three agreements and pay the $5,500 on account of the purchase price, and the trial court believed him.

(2) Defendant asserts that the general agency contracts with the Merchants, Halifax and Mid-States companies were "illusory" in that they did not impose upon anyone an obligation to do anything, each reserving to the company the right

to reject, cancel, or reduce its liability in respect to policies initially accepted; that those contracts merely established a market to which the agent might submit risks for acceptance or rejection by the company. Defendant also states in this connection that the cancellations by Merchants and Mid-States pertained only to future business, not to business previously written by the general agent. He then urges that these matters must have been well known to plaintiff who had had years of experience in this field.

Defendant does not state clearly or with precision what these facts have to do with the case. ■ By these contracts each of the insurance companies mentioned had appointed defendant its general agent in a given territory with power in him to appoint local agents and the right to receive commissions upon business written. Such an agent is in effect the general representative of the company in the area defined by the contract, which, until canceled by either party, creates a relationship and opens up a market which the evidence indicates is a substantial asset of the agent's business.

(3) Defendant asserts that the subject matter of the sale was the agency business (the records and files, the clientele and good will, the services of the employees and of the defendant) which plaintiff did obtain. He asserts that the existence or nonexistence of a general agency contract with any particular insurance company or companies was therefore quite immaterial. The fallacy of this argument inheres in the fact that it ignores, among other things, defendant's representations that he had general agency contracts with certain companies and that his relationship with those companies was satisfactory and profitable to the companies and the agency, upon the truth of which representations plaintiff relied in making his decision to buy this business. As we have already indicated those contracts constituted a material part of the consideration.

■ (4) In relation to the partnership, defendant claims that if it was a partnership no action could be maintained by one partner against another until the rights of the creditors had been determined, and then says this transaction was really a sale (not a partnership), and concludes that the liability, if any, to the Halifax Insurance Company should have been assessed to the plaintiff as purchaser. It is true that the partnership was but an incident of the sale, a temporary "partnership" to facilitate the transfer of this business from

defendant to the plaintiff in such a manner as to give added assurance of acquisition by plaintiff of the clientele and of the business of the companies for whom defendant had been acting as general agent. The argument fails because the entire transaction (the sale and the incidental partnership) was rescinded by the plaintiff because of the false representations of the defendant upon which plaintiff relied when making the purchase.

■ (5) Concerning the settlement of accounts as of July 1, 1946, defendant says that the accounts current were customarily settled in approximately 90 days, involving as it did the clearing of accounts with local agents, a custom or practice which in no way interfered with the sale of the business and had no significant bearing upon the sale. However, there is evidence showing an unqualified representation that all indebtedness to the companies would be paid and settled (as of July 1, 1946) by the time agreed upon for plaintiff to take over the management, and that this was not done.

■ (6) Concerning his undertaking to procure plaintiff's appointment as general agent for the insurance companies and to procure for plaintiff a license from the State Insurance Commissioner, defendant claims those were not representations upon which plaintiff could rely because he must have known that defendant did not have the power to effect them. This argument also misses the point. The representations upon which plaintiff relied were defendant's undertaking to utilize his identity, render his efforts to the retention of the agency business being sold, and to take the necessary steps to have plaintiff appointed general agent and to file with the Insurance Commissioner documents evidencing such appointments, promises which defendant made without any intention of carrying them out. The fact that the companies, not defendant, had the power to appoint or not to appoint plaintiff their general agent and that the Insurance Commissioner, not defendant, had the granting or withholding of the state license, cannot save defendant from the legal consequences of his falsely promising and failing to use his good offices in furtherance of those appointments and the issuance of the license.

■ (7) A further argument of the defendant turns upon the asserted fact that plaintiff had been and was general agent for a certain board fire insurance company and could not (under board of fire underwriters regulations) retain that agency if he became general agent for defendant's fire insur-

ance companies, which were nonboard.* What that had to do with the truth or falsity of the representations which defendant made concerning his companies and his status with them, and his promise to use his best efforts to have plaintiff appointed their general agent, is not clear. Plaintiff's retention or loss of his board company would seem to be of no concern to defendant. Moreover, among the representations which defendant made was one that his companies were going board. Halifax did go board before plaintiff took over the management of the business, and we have found nothing in the record indicating that there was anything to prevent a person from being general agent for a nonboard casualty company (Mid-States) while also representing board fire insurance companies. Merchants Fire Insurance Company, as we have noted, canceled defendant's agency with it prior to the commencement of negotiations between plaintiff and defendant. We find no merit in this contention.

(8) Defendant claims he was prejudiced and denied a fair trial because, assertedly, he was not represented by his attorney during the last two days of the trial and was not given the notice required by section 286 of the Code of Civil Procedure. There is no merit in this contention. The trial extended over ten court days. Milton Marks was attorney of record for defendant. He conducted the first eight days of the trial on behalf of defendant and then became ill and was hospitalized. His son, Milton Marks, Jr., associated with him in the practice of the law, attended and assisted during all of those eight days, except one day when he was ill, and actively participated throughout the remainder of the trial. That was in March, 1950. On May 5, 1950, defendant filed a writing subscribed by him declaring that he thereby substituted "Philip Steiner . . . as his attorney . . . in the place and stead of Milton Marks, Jr." This document also bore the signature of Marks, Jr., consenting to the substitution, and of Steiner agreeing to be substituted. Yet, on July 7, 1950, in support of his motion for new trial, defendant filed an affidavit in which he said he was not advised that the son could not appear for defendant until "substituted" for the father; that defendant did not express consent to the "substitution" of the one for the other; that he made no application to the court for

*This transaction took place prior to the rendition (September 20, 1946) of the decision in *Speegle* v. *Board of Fire Underwriters*, 29 Cal. 2d 34 [172 P.2d 867], which determined that such regulations were proscribed by the Cartwright Act.

such a "substitution"; and, to the best of his knowledge and belief, no order of court was made providing for such "substitution." Significantly, we think, defendant in this affidavit did not say that Milton Marks, Jr., conducted the last two days of the trial on behalf of defendant without the latter's consent or without defendant's having requested him so to act. Defendant, in his affidavit, was speaking only of a *formal* "substitution." It further appears from an affidavit by Milton Marks, Jr., that at the outset of the trial the court announced that the affiant was one of the attorneys for the defendant; that, to the best of his recollection, his father during the course of the trial stated in open court that he was associating affiant as one of the attorneys for the defendant; that affiant participated in the trial on defendant's behalf with defendant's full knowledge, authority and consent; that upon the day of his father's hospitalization he informed defendant of his readiness to conduct the trial to a conclusion and defendant told affiant he had confidence in affiant and desired him to proceed in defendant's behalf; that counsel for plaintiff offered to postpone the trial but defendant desired to have the case go on without further interruption and delay; that affiant continued to represent defendant and acted as his attorney during the two remaining days of the session with defendant's full knowledge, authorization and consent; that after the cause was argued and submitted for decision defendant expressed his complete satisfaction as to the manner in which affiant had handled the case. Alvin A. Lobree, one of plaintiff's attorneys, in his affidavit stated that at the beginning of the trial the court announced the names of all the attorneys of record for the parties, specifically announcing Milton Marks, Jr., as one of the attorneys of record for the defendant; that during the course of the trial Milton Marks, Sr., stated in open court that Milton Marks, Jr., was associated with him as one of the attorneys of record for the defendant; that Milton Marks, Jr., actively participated except for one day during the first eight days of the trial; that defendant was present throughout and conferred actively with Milton Marks, Sr., and Milton Marks, Jr. The trial judge had these affidavits before him when considering defendant's motion for a new trial. In denying that motion the judge, who presided at the trial and knew what happened during its course, impliedly found that defendant was represented by legal counsel throughout the trial and that there was no need or occasion for a substitution of attorneys to effect such repre-

sentation during the last two days of the trial. The record amply supports that finding.

(9) Next, defendant claims he was excused from performing that part of the agreement which dealt with the appointment of plaintiff as general agent and the introduction of plaintiff to the local agents because after respondent took over management of the business August 17, 1946, the parties were negotiating with respect to termination of the agreement. This point is without merit. Prior to August 17, plaintiff discovered the falsity of the representation concerning Merchants Fire Insurance Company. It was between August 17 and September 3 that he discovered the falsity of the other representations, and notified defendant thereof and demanded return of the $5,500. Thereupon, at defendant's request, negotiations ensued for settlement of the respective rights and duties of the parties, negotiations which defendant terminated in November, followed by plaintiff's formal notice of rescission in December, 1946. There was nothing in that situation which could or did absolve defendant from the legal consequences of defendant's failure, before or after August 17, to use his good offices in furthering plaintiff's appointment as general agent and in failing to put him in contact with the local agents.

(10) Defendant claims that the transaction between him and third parties after receipt of plaintiff's formal notice of rescission did not operate as ratification and acceptance of the rescission as found by the court. Defendant claims that he was merely making the best of a difficult situation thrust upon him by the plaintiff when the latter assertedly "abandoned the office." The answer to this contention is that the trial court found as a fact that defendant ratified and accepted the rescission of the agreements, a finding which the evidence supports.

(11) In his closing brief defendant discusses at some length a point not developed in his opening brief. It bears upon the propriety of the trial court's denial of defendant's motion for a new trial. One of the grounds of that motion was the asserted discovery of new evidence, consisting of an agreement for the dissolution of the partnership of Reed & Ellis, dated July 1, 1946, and the transcript of a hearing held in July, 1947, before a hearing officer for the State Insurance Commissioner in the matter of the application of plaintiff herein (doing business as Frank J. Reed General Agency) for a license to act as an insurance agent.

He claims these documents are material to show: (a) Plaintiff knew the insurance business, already represented nine companies, testified at the state insurance hearing that the value of a general agency company is the right to participate and the chance that the representation will continue; hence, that plaintiff could not have relied upon defendant's assurance he would get those agencies. The evidence thus proffered is merely cumulative upon an uncontroverted issue. Plaintiff testified he had been in the insurance business ever since 1920, and demonstrated by his testimony thorough familiarity with the distinction between board and nonboard companies and the relationship between a company and its general agent. The remainder of the answer to this contention will be found in paragraph (6), above. (b) Plaintiff testified before the hearing officer that conditions were strained between him and a former partner, Ellis, at the time of the dissolution of their partnership in July, 1946, which, coupled with plaintiff's desire to retain a general agency contract which that partnership had with a certain board company and the fact that defendant was getting the additional insurance business, defendant claims would show that in his agreements with defendant plaintiff was merely buying a business, not bargaining for company representation. Defendant has not directed our attention to any of plaintiff's testimony given upon the trial of this action which was inconsistent with that given before the hearing officer and we do not see the cogency or the relevancy of defendant's highly speculative process of reasoning. His argument under this heading is somewhat akin to the arguments discussed in paragraphs (3) and (7), above. (c) In his testimony before the hearing officer, plaintiff said there was no discussion between him and defendant as to obtaining a partnership license. Defendant does not indicate how that bears upon the issues in this case or that it tends to impeach any of plaintiff's testimony which in this regard was that, as found by the trial court, defendant promised to file with Insurance Commissioner documents evidencing the appointment of plaintiff as general agent for the Merchants, Mid-States and Halifax companies. (d) Two accountants employed by the Halifax company testified that they had examined the books of the business which defendant sold to plaintiff and found no deficit as of July 1, 1946. They found an excess of receipts over expenditures of about $600 during July and about $400 in August and a loss during each of the months of September through December, 1946.

We fail to see how the transcript of their testimony in such a proceeding could have been introduced at the trial of this case. Those witnesses were not the agents of plaintiff. Their statements were not his statements, nor has defendant made any affirmative showing that the facts purportedly evidenced by the testimony of those accountants were unknown or unavailable to defendant prior to or during the trial of this action, however relevant or irrelevant those facts may have been to the issues of this case.

Moreover, defendant has not made a clear showing of lack of knowledge and inability to produce at the trial the two documents here under discussion. As early as October 19 defendant verified and on October 20, 1949, filed his answer to a supplemental complaint which described in some detail the proceedings and issues before the Insurance Commissioner, and mentioned the firm of Reed & Ellis and the date of its dissolution. The taking of evidence upon the trial took place during the period March 7 to 24, 1950. The substitution of defendant's present attorney was dated May 4 and filed May 5, 1950. In his affidavit upon motion for new trial defendant said he knew his former attorney, Milton Marks, Sr., had evidence of the administrative hearing before the Department of Insurance, that during the trial he heard plaintiff testify that the firm of Reed & Ellis had been dissolved, that about May 8, 1950, he was asked by his new attorney concerning the terms of that dissolution and on May 10, 1950, first learned of the existence of a written agreement containing the terms of that dissolution. The record discloses no move upon behalf of defendant to reopen the trial for presentation of this evidence even though it was not until June 5, 1950, that findings of fact and conclusions of law, bearing date May 5, were filed. Application for the consideration of that evidence was not made until after judgment, upon motion for a new trial. We find nothing in the record that would serve as a basis for holding that the court below committed any abuse of discretion in denying that motion.

The judgment is affirmed.

Peters, P. J., and Bray, J., concurred.

A petition for a rehearing was denied July 25, 1952, and appellant's petition for a hearing by the Supreme Court was denied August 21, 1952.